UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| JOSEPH BRENNAN and CHRIS BRENNAN, | : | CIVIL ACTION NOS. |
| on their behalf and on the behalf of their son | : | |
| Joshua Brennan, | : | 3:06-CV-1410 (JCH); |
| Plaintiffs/ | : | 3:07-CV-867 (JCH) |
| Consolidated Defendants | : | |
| v. | : | DECEMBER 27, 2007 |
| | : | |
| REGIONAL SCHOOL DISTRICT NO. 1 | : | |
| BOARD OF EDUCATION; PATRICIA | : | |
| CHAMBERLAIN, Superintendent of Schools, | : | |
| Regional School District No. 1; THERESA | : | |
| TERRY, Pupil Services Director, Regional | : | |
| School District No. 1, | : | |
| Defendants/ | : | |
| Consolidated Plaintiffs | : | |

**RULING ON PLAINTIFFS' MOTION FOR PARTIAL SUMMARY JUDGMENT [DOC. NO. 28]; PLAINTIFFS' MOTION TO EXPEDITE [DOC. NO. 31]; PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT [DOC. NO. 66]; DEFENDANTS' MOTION FOR SUMMARY JUDGMENT [DOC. NO. 64]; CONSOLIDATED DEFENDANTS' MOTION TO STRIKE [DOC. NOS. 45 & 56]; DEFENDANTS' MOTION TO STRIKE [DOC. NO. 77]; PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT [DOC. NO. 82]**

This case involves two consolidated actions, both of which arise primarily under

the Individuals with Disabilities Education Act (IDEA), 20 U.S.C. § 1400 et seq. Joseph

Brennan and Chris Brennan, on their own behalf and on behalf of their son J.B.,

brought an administrative proceeding against the Regional School District No. 1 Board

of Education ("District 1"). The Brennans argued that District 1 did not comply with

IDEA because it failed to provide a free appropriate public education ("FAPE") for J.B.

The Hearing Officer ("HO") agreed in part: she concluded that District 1 had not

provided J.B. with a FAPE during the 2003-2004 school year, as well as during two

summers. However, the HO also concluded that District 1 had provided a FAPE during

the 2002-2003 school year and during the 2004-2005 school year.

Shortly after the HO's decision was issued, the parents filed suit in this court seeking, <u>inter alia</u>, to appeal the portions of the decision that were adverse to them, and to enforce the portions of the decision that were favorable to them. Doc. No. 1 Nine months later, District 1 filed its own action in this court, purporting to appeal the portions of the administrative decision (as later clarified by the HO) that were favorable to the parents. Doc. No. 2 in Case No. 07-cv-867.

The parents have filed three different motions for summary judgment on their Complaint, while District 1 has filed a cross-motion for summary judgment. Additionally, the parents have filed what they term a "Motion to Strike" the Complaint in the District's suit. For the reasons that follow, the court treats the parents' "Motion to Strike" as a Rule 12(b)(6) motion to dismiss and **GRANTS** that motion. The court **DENIES** the parents' first motion for summary judgment and instead **DISMISSES** the parents' enforcement claim due to lack of subject matter jurisdiction. The court **GRANTS IN PART** and **DENIES IN PART** the parents' second motion for summary judgment. The court **GRANTS IN PART** and **DENIES IN PART** District 1's cross-motion for summary judgment. The court **DENIES** the parents' third motion for summary judgment.

## I.    BACKGROUND

At all times pertinent to this lawsuit, J.B. and his parents resided in Salisbury, Connecticut. By virtue of his residence, J.B. was a student in District 1's public schools from pre-kindergarten through his freshman year of high school. J.B. is and was mentally disabled at all relevant times. Specifically, J.B. has been diagnosed as having

an intellectual disability, right brain impairment, and pervasive developmental delays. These affect J.B.'s ability to process spatial information, to do linguistic processing, to do social/emotional processing, and to integrate visual and verbal information. The parties agree that J.B.'s disability renders him eligible for special education and related services under IDEA. District 1 accordingly provided J.B. with special education services throughout his educational career.

Under Connecticut and federal law, a Planning and Placement Team ("PPT") is the entity empowered to make educational decisions for J.B. Pursuant to a recommendation from the PPT, and with the agreement of his parents, J.B. spent the 2000-2001 and 2001-2002 school years in a specialized "TOTAL" program at the Sharon Central School that is specifically designed for special education students. "TOTAL" is an acronym that stands for "Teaching Opportunities To All Learners;" students in TOTAL take academic classes together taught by a special education teacher. 7/12/05 Hearing Tr. at 56-61. The TOTAL program provides students with pragmatic language skills and speech therapy throughout the day. 7/22/05 Hearing Tr. at 91-92. The school district describes the TOTAL program as a "multi-age non-graded program," and it contends that the children in the TOTAL program span the fourth through eighth grades. See District 1's 8/1/07 Loc. R. 56(a)(2) Statement ("District 1's 8/1 56(a)(2) Stat.") at ¶ 14.

On May 31, 2002, the PPT met and created an Individualized Education Program (IEP) recommending that J.B. again participate in the TOTAL program for the upcoming 2002-2003 school year. J.B. did so, and his academic classes were in the self-contained TOTAL classroom. Hearing Exh. B-7 at 1, 30. Within the TOTAL

program, J.B. was also given 30 minutes per week of motor planning from an occupational therapist. 7/8/05 Hearing Tr. at 65-66; Hearing Exh. B-7 at 30. Outside the TOTAL program, J.B. took mainstream classes in Band, Music, Art, and Gym. Hearing Exh. B-7 at 1. The parents believe that during this year J.B. was enrolled in the sixth grade. See Parents' 6/20/07 Loc. R. 56(a)(1) Statement ("Parents' 6/20 56(a)(1) Stat.") at ¶ 14. J.B. was born in October 1987; by Spring 2003 he was 15 years old.

Towards the end of the 2002-2003 school year, the PPT met on at least two occasions to discuss J.B. Those meetings took place on April 25, 2003 and June 9, 2003, and they concerned J.B.'s IEP for 2003-2004. The PPT's recommendations from those meetings do not expressly include a statement that J.B. should be transferred to the Housatonic Valley Regional High School ("HVRHS"), although the IEP plainly contemplated such a transfer for 2003-2004. See Hearing Exh. B-10 at 1-2; Hearing Exh. B-12 at 1. The PPT did not offer J.B. any placement for Summer 2003. Id. at 12.

J.B. went on to attend HVRHS for 2003-2004, taking a modified ninth grade curriculum. He received special education instruction in English, Math, and Social Studies. Additionally, J.B. was enrolled in an Agricultural Technology course at HVRHS that included a "supervised agricultural experience." Hearing Exh. B-12 at 12. The remainder of his schedule involved mainstream courses, as well as additional time for academic support in a self-contained resource room. See District 1's Loc. R. 56(a)(1) Statement ("District 1's 56(a)(1) Stat.) at ¶ 27; Parents' Loc. R. 56(a)(2) Statement ("Parents' 56(a)(2) Stat.") at ¶ 27; Hearing Exh. B-10 at 1-2; Hearing Exh. B-12 at 1-2, 12. The 2003-2004 IEP did not have a formal speech and language component.

In March 2004, the parents notified school officials that they believed that J.B.

4

had been the subject of bullying at HVRHS.  8/10/05 Hearing Tr. at 25.  School officials investigated, and based on this investigation they concluded that no bullying was taking place.  See District 1's 56(a)(1) Stat. at ¶ 28.[1]  The parents were apparently not satisfied with the school's response, and they continued to believe that J.B. was at risk of being subjected to future bullying incidents.

On April 19, 2004, the PPT convened for another meeting regarding J.B.  The parents asked District 1 to place J.B. at a private school for Summer 2004, and for the 2004-2005 school year.  Specifically, the parents requested that J.B. be placed at the Maplebrook School in Amenia, NY; Maplebrook is a school specifically designed for students with disabilities, and most students who attend there suffer from ADD or ADHD.  See  Hearing Tr. 5/23/05 at 113; District 1's 56(a)(1) Stat. at ¶ 54; Parents 56(a)(2) Stat. at ¶ 54.  The parents informed District 1 that, if their request was denied, they would unilaterally enroll J.B. at Maplebrook.  The PPT denied the parents' request.

Nonetheless, in April and May 2004, District 1 proceeded to examine additional reports and to conduct additional testing on J.B.  The PPT then reconvened on June 10, 2004, and it offered to place J.B. in a four week summer program at the Litchfield County Association of Retarded Citizens.  It also proposed a new IEP for J.B. at HVRHS for the 2004-2005 regular academic year that contained a significant amount of special education services – approximately 18.75 hours a week, which was more than J.B. had been given under his previous IEP.  See District 1's 56(a)(1) Stat. at ¶¶ 37, 39;

---

[1] Although the parents contest this statement in their Rule 56(a)(2) statement, they do not cite any evidence in the record which shows this fact to be in dispute.  See Parents' 56(a)(2) Stat. at ¶ 28.

Parents 56(a)(2) Stat. at ¶¶ 37, 39.  The only regular education classes on J.B.'s schedule would be Biology, Vocational Education, Physical Education, and Lunch. Hearing Exh. B-25 at 42.  The proposal also contained 45 minutes a week of speech and language services, id., and it required that an occupational therapist and a physical therapist consult with J.B.'s teachers for one hour each month.  Id. at 1, 45.  In all classes, J.B. was to be given a number of special modifications, including specially modified testing, modified lesson content, and modified instructional methods designed to reduce reliance on visual information.  Id. at 45.

The parents were apparently unsatisfied with this IEP, and at the June 10 meeting the parents again requested that J.B. be placed at the Maplebrook School. District 1 again refused.

The next day, June 11, 2004, the parents sent school officials a note stating that J.B. "is not in a safe environment at [HVRHS].  We need to remove him immediately for his safety."  Hearing Exh. B-26.  Two days later, the parents sent a more detailed letter to the school in which they asserted that on June 9, 2004, an individual had dropped a firecracker at J.B.'s feet.  Hearing Exh. B-27.  The letter went on to state that on Friday, June 11, 2004, the parents had removed J.B. from HVRHS.  Id.  The letter concluded by requesting information on the safety measures that the school planned to put into place.  Id.

J.B. returned to school the following Monday.  Hearing Tr. 8/29/05 at 28.  At the request of his parents, school officials proceeded to ensure that a staff member followed J.B. around school at all times.  Id.  This supervision continued for the remainder of the 2003-2004 school year.  Id.

6

That school year was J.B.'s last in the District 1 schools. At some time in May or June of 2004 (the parties dispute the exact date), J.B.'s parents proceeded to enroll him at Maplebrook for Summer 2004 and for the regular 2004-2005 school year. See Parents' 6/20 56(a)(1) Stat. at ¶¶ 28-29; District 1's 8/1 56(a)(2) Stat. at ¶¶ 28-29. J.B. also attended Maplebrook for Summer 2005, and for the regular 2005-2006 school year.

At the parents' request, the PPT convened another meeting on November 30, 2004. Hearing Exh. B-35 at 2. The parents requested that District 1 reimburse them for J.B.'s tuition at Maplebrook for 2004-2005. The parents also stated their intention to keep J.B. at Maplebrook for 2005-2006 and 2006-2007 (i.e. through J.B.'s twelfth grade year), and they requested that District 1 pay for those years as well. Id. They further requested that District 1 pay for J.B. to have three years of post-secondary education at Maplebrook (i.e. through the 2009-2010 school year). Id. The PPT refused, but it did renew its offer to implement the IEP offered at the June 2004 meeting. The parents again declined.

On or about February 4, 2005, the parents requested a due process hearing before the Connecticut State Board of Education ("BOE"). Admin. Rec. ("A.R.") 3; District 1's 56(a)(1) Stat. at ¶ 55; Parents' 56(a)(2) Stat. at ¶ 55. The matter was assigned to Hearing Officer Kearns. A.R. 4 at 1.

On February 22, 2005, the parents sent a letter to the HO identifying the issues they would be raising at the hearing. In full, the parents identified the issues as follows:

1. [District 1] failed to provide [J.B.] with an appropriate education for the 2002-2003 and 2003-2004 school years.

a. [District 1] provided inappropriate academic benefit, physical education, extracurricular activities, speech skills, transitional services, vocational services, and prosocial services.

b. [District 1] violated certain state constitutional [provisions], state and federal statutes and administrative regulations in failing to provide an appropriate education, i.e. <u>inter alia</u>, regarding notice to the parents, parental participation in IEP and placement decisions, evaluation of the child, content of the IEP, and provision of an appropriate education.

2. [District 1] took inappropriate or ineffective action in preventing bullying of the child while in school, and in enabling the child to participate in the benefits of an appropriate education, such that [J.B.] was excluded from participation in, denied the benefits of, or otherwise subjected to discrimination on the basis of his handicap.

3.[District 1] improperly denied the parent[s'] request to place the child in the Maplebrook School and request for the district to pay for [J.B.] to attend Maplebrook School for his sophomore, junior and senior years of high school, including summer school, and a post secondary program to fully integrate living skills and vocational training.

A.R. 14 at 1-2.

The HO convened an initial hearing for the case in March 2005. However, the full administrative process spanned more than twenty different hearing dates, and it involved the testimony of 17 witnesses. Both sides also presented a number of exhibits. The final hearing date was November 16, 2005, and the mailing date for the HO's decision was August 10, 2006.

In her final Order, the HO offered a number of findings of fact and conclusions of law. Her first key conclusion was that District 1 had provided a FAPE during the 2002-2003 school year. Although the parents had claimed that the evaluations underlying

the 2002-2003 IEP were procedurally deficient, the HO rejected this claim as time barred and because she apparently thought that any errors did not prejudice the student. A.R. 1 at 13-14. The HO also went on to reject the parent's substantive arguments for inadequacy, concluding that the child "made a reasonable amount of progress and benefitted from the [TOTAL] program" in 2002-2003. Id. at 14-15.

Next, the HO turned to the 2003-2004 IEP and concluded that it was inadequate. In particular, she pointed to the fact that the IEP called for several mainstream classes while providing insufficient additional support services. Id. at 15-16. She also criticized the IEP's failure to provide speech and language instruction, and she found that the relatively sudden transition to high school had a significantly negative impact on J.B.'s social development. Id. at 16. Finally, the HO reviewed the progress J.B. had made during 2003-2004, and she concluded that this progress had been trivial. Id. at 16-17.

The HO also agreed with the parents' claim that J.B. had been denied a FAPE during Summer 2004. The HO explained that J.B.'s extremely poor performance during 2003-2004 should have triggered the provision of extended year services. Although the PPT did offer a summer program for 2004, the HO found that this program was not academic enough, and she concluded that the parents were justified in enrolling J.B. at Maplebrook for Summer 2004. Id. at 17.

The HO next turned to the 2004-2005 IEP, and she noted that it reflected significant improvements over the previous year's proposal. Based on these improvements, the hearing officer found that "[t]he IEP is reasonably calculated to provide the child with skills necessary for the world of work, job-interviewing, self-advocacy, [and] give and take conversations with co-workers and peers." Id. at 17.

Accordingly, she concluded that the 2004-2005 IEP could provide J.B. with a FAPE.

The HO then offered her further conclusion that the Summer 2005 program had denied J.B. a FAPE, though she did not explain why.  Id. at 18.  She also concluded that Maplebrook provided an appropriate placement for J.B. for any years in which District 1's IEP was deemed inadequate.

At the end of her decision, the HO listed five final orders:

> 1. [District 1] had an individualized education program for the 2002-2003 school year that could provide the child with a free and appropriate public education.  The parents' request for reimbursement is denied.
>
> 2. [District 1] did not have an individualized education program for the 2003-2004 regular school year that could provide the child with a free and appropriate public education.  The parents shall receive a compensatory payment for the cost incurred for the 2004-2005 regular school year.
>
> 3. [District 1] did not have an individualized education program for the summer 2004 extended school year that could provide the child with a free and appropriate public education.  The parents shall receive a payment for cost incurred for the 2004 extended school year program.
>
> 4. [District 1] had an individualized education program for the 2004-2005 regular school year that could provide the child with a free and appropriate public education.  The parents' request for reimbursement is denied.
>
> 5. [District 1] did not have an individualized education program for the summer 2005 extended school year [that] could provide the child with a free and appropriate public education.  The parents shall receive a payment for cost incurred for the 2005 extended school year program.

A.R. 1 at 19.

Fifteen days after the HO issued her decision, an official in the BOE, Thomas

Badway, began taking steps to enforce the parts of the decision that favored the parents. By letter dated August 25, 2006, Badway informed counsel for both sides that Connecticut law required the BOE to "take appropriate action to enforce the decision of the hearing officer, if the . . . school district . . . does not take action on the decision" within 15 days. A.R. 72; see also Conn. Gen. Stat. § 10-76h(d)(2). Badway requested both parties to "inform [the BOE] immediately [regarding] in what manner the decision of the hearing officer has been implemented." A.R. 72.

On the same date that Badway sent this letter, the parents filed a motion with the HO requesting reconsideration of the parts of the decision that were adverse to them. A.R. 74. This motion was accompanied by another motion from the parents requesting clarification on exactly what compensatory costs the parents would be awarded for 2003-2004, as well as clarification on the rationales for the parts of the decision that were adverse to the parents. A.R. 73.

Then, by letter dated August 31, 2006, the parents' attorney responded to Badway's letter about enforcement. The parents' attorney stated that District 1 "ha[d] not taken any action at all" regarding the HO's decision, and the attorney requested that the BOE enforce the parents' award. A.R. 74.

There is no indication in the record that District 1 ever filed a response to the BOE's letter. However, on September 8, 2006, District 1 did file its own motion for clarification with the HO. The school district questioned the HO's finding regarding Summer 2005, pointing out that the last education programs in evidence were the ones for Summer 2004 and for the 2004-2005 school year.

Before the HO or the BOE had responded to any of these filings and letters, and

also on September 8, 2006, the parents filed a Complaint in federal court.  In their

Complaint, the parents sought to appeal from the portions of the HO's decision that

were adverse to them, and they also sought to enforce the portion of the decision in

which the HO gave them a monetary award.  In addition, the parents raised a variety of

other claims: (1) that District 1 discriminated against J.B. in violation of the

Rehabilitation Act, 29 U.S.C. § 794; (2) that District 1 discriminated against J.B. in

violation of the Americans with Disabilities Act, 42 U.S.C. § 12132 et seq.; (3) that

District 1 discriminated against J.B. in violation of 28 U.S.C. § 1983; and (4) that the HO

had failed to rule on a variety of issues that were properly before her, including a claim

that Maplebrook should appropriately be regarded as J.B.'s "stay-put" placement for

purposes of 20 U.S.C. § 1415(j) (2000)[2] (current version at 20 U.S.C. § 1415(j) (West

Supp. 2007)).[3]

Approximately one month after the parents filed their lawsuit, the BOE

responded to the parents' request for enforcement.  In its letter, the BOE noted that the

parents had filed a lawsuit in federal court that sought enforcement of the HO's

decision.  In light of this, the BOE stated that "the enforcement of the decision by this

office will be held in abeyance pending the decision of the court."  A.R. 76.

---

[2] Unless otherwise noted, all citations to IDEA are to the version of the statute
that existed as of January 2002.

[3] In addition to naming District 1 as a defendant, the complaint also named as
defendants Patricia Chamberlain, District 1's Superintendent, and Theresa Terry,
District 1's pupil services director.  Both are sued only in their official capacities.
In analyzing the parents' claims, both sides have treated the official capacity
defendants identically to District 1.  Following the lead of the parties, the court will do
the same.

Meanwhile, as of April 17, 2007, the HO had still not yet ruled on either side's motion for clarification, nor had she ruled on the parents' motion for reconsideration. On that date, the parents filed a motion in this court seeking partial summary judgment on their Complaint. They argued that they were entitled to enforcement of the parts of the administrative order that were favorable to them, and they requested that the court order District 1 to pay them a total of $34,968.56 for the 2004-2005 school year, the 2004 summer program, and the 2005 summer program.

Approximately one month later, on May 22, 2007, the HO finally filed her response to the parties' motions for clarification. The HO stated that, at the time the parents had requested a due process hearing, District 1 had not yet proposed an educational program for summer 2005, and for the 2005-2006 school year. The officer concluded that she had therefore erred in finding the proposal for Summer 2005 to be inadequate, and she amended her order so that it found summers 2003 and 2004 inadequate, rather than summers 2004 and 2005.[4] No other substantive changes were made to the final order.

The next day, May 23, 2007, District 1 filed a motion for extension of time to file a cross-motion for summary judgment on the parents' complaint – a deadline that the Court had previously determined would be May 31, 2007. In partial support of their motion for the extension, the defendants represented that District 1 intended to file an appeal from the hearing officer's amended decision.

The court proceeded to grant the motion in part on May 24, giving the

_____

[4] Consistent with this change, the hearing officer also amended the portion of her final decision in which she stated the issues that were before her.

defendants until June 21, 2007 to oppose the parents' motion for partial summary judgment, and to file their own cross-motion for summary judgment. The court's order also stated that, "[t]o the extent defendants seek any other relief in their motion for extension, it is denied."

On June 1, 2007, District 1 filed a Complaint in this court purporting to appeal from the hearing officer's "clarified" decision. District 1 argued that the HO erred in concluding that the district's proposals for the 2003-2004 regular school year, and for Summer 2004, were inadequate. District 1 also sought a declaratory judgment that the parents were not prevailing parties on the issues related to those years. The Complaint did not purport to challenge the HO's finding that the 2003 summer program had been inadequate.[5]

The parents quickly responded to the district's suit with what they termed a "motion to strike the complaint." This motion primarily rested on two grounds. First, the parents argued that the suit was untimely. Second, they argued that the filing of the Complaint was foreclosed by this court's May 24 Order – an order that the parents described as having "denied [District 1's] request . . . to file an appeal of the Hearing Officer's Decision." Doc. No. 45 at 2.

Meanwhile, both parties proceeded to file cross-motions for summary judgment in the parents' suit. The parents filed for summary judgment for some of the claims in their Complaint, while District 1 cross-moved for summary judgment on all of the claims

---

[5] The district's lawsuit was originally filed under a separate docket number, and assigned to a different judge. After transfer, the court ordered that the two cases be consolidated.

in that Complaint.  District 1 also filed its opposition to the parents' earlier-filed Motion

for Partial Summary Judgment.  The court subsequently held oral argument.  It

permitted the parents to file a supplemental summary judgment motion regarding

additional claims in their complaint.  The court clearly informed the parents that, given

that all parties had agreed the case would be decided on the administrative record,

failure to affirmatively move for summary judgment on a claim would be deemed an

abandonment of that claim.

## II.     PARENTS' "MOTION TO STRIKE"

The parents have not yet filed an answer to the district's Complaint.  Because

the "motion to strike" is in essence a claim that District 1 has failed to state a claim upon

which relief can be granted, the court will treat the parents' motion as a motion to

dismiss pursuant to Fed. R. Civ. P. 12(b)(6).[6]

As a threshold matter, the court rejects the parents' contention that this court's

May 24 Order precludes District 1 from filing its appeal.  Even assuming that the May

24 Order can be read as denying, with prejudice, all relief that District 1 had requested

(other than the relief the court had already granted), the court finds that District 1 did

not actually request leave to file a belated appeal of the hearing officer's decision.

Instead, to the extent that District 1 can be said to have touched on the issue at all, it

simply requested a "twenty-one (21) day extension of time" to, inter alia, "enable

_____

[6] Insofar as the parents contend that dismissal is warranted due to the
defendants' purported noncompliance with a court order, the parents suggest that the
authority for their motion comes from Fed. R. Civ. P. 41(b).  Because the court
concludes that there has been no such noncompliance, it would not change the
outcome if the court treated this part of the parents' motion as arising under Rule 41(b).

[District 1] to file its appeal" of the hearing officer's decision. Doc. No. 39 at 1; see also id. at 7-8. District 1 did not request leave of the court to file an appeal that was otherwise timely (nor would District 1 have needed to request such leave), and the court's Order did not intend to prevent District 1 from filing such an appeal.

The court does, however, agree with the parents that District 1's appeal is untimely. Under IDEA, if a party is dissatisfied with the outcome of a state educational agency's due process hearing, that party may take an appeal by filing a civil action in federal district court. See 20 U.S.C. §§ 1415(f), (i)(2)(A). If state law provides a time limit for bringing appeals in IDEA cases, that time limit must govern. 20 U.S.C. § 1415(i)(2)(B) (West Supp. 2007).[7] Connecticut law has such a time limit. See Conn. Gen. Stat. § 10-76h(d)(4) (explaining that "[a]ppeals from the decision of a hearing officer . . . [in an IDEA case] shall be taken in the manner set forth in [Conn. Gen. Stat.

---

[7] The current version of 20 U.S.C. § 1415(i)(2)(B) is a relatively recent provision, enacted as part of the Individuals with Disabilities Education Improvement Act of 2004 (IDEIA), Pub. L. No. 108-446, § 615, 118 Stat. 2467, 2724. This provision of IDEIA, like most provisions of IDEIA, was made effective on July 1, 2005. See IDEIA § 302(a)(1). Prior to IDEIA's enactment, federal law was silent as to the time limits for taking an appeal in an IDEA case. See 20 U.S.C. § 1415 (2000).

In this case, the HO's decision was not mailed out until August 10, 2006, and so IDEIA might seem to govern the timing of District 1's appeal. However, the parents first commenced administrative proceedings in February 2005, before IDEIA's effective date, which creates a potentially complicated issue of which version of the statute governs the timing of District 1's appeal. The parties have not addressed this issue specifically, though both parties have suggested in other filings that, as a general matter, IDEIA does not apply to this case.

The court need not determine which version of the statute governs the timing of the appeal. No party argues that anything other than Connecticut law provides the relevant time limit for the school district. Indeed, even if IDEIA's appeal provisions do not apply to this case, the court concludes that Connecticut law would nevertheless provide the appropriate time limitation. See M.D. v. Southington Bd. of Educ., 334 F.3d 217, 221-222 (2d Cir. 2003) (explaining that, when IDEA fails to provide a time limitation for action, the general practice is to borrow the analogous state limitations period).

§] 4-183"); id. § 4-183(c) (providing general time limits for the taking of an appeal from an administrative decision). Accordingly, this court must apply Connecticut's time limits, as laid out in Conn. Gen. Stat. § 4-183(c).

Section 4-183(c) is part of Connecticut's Uniform Administrative Procedure Act (UAPA). That section provides, in relevant part, that an appeal must be taken

> (1) Within forty-five days after mailing of the final decision under section 4-180 or, if there is no mailing, within forty-five days after personal delivery of the final decision under said section, or (2) within forty-five days after the agency denies a petition for reconsideration of the final decision pursuant to subdivision (1) of subsection (a) of section 4-181a, or (3) within forty-five days after mailing of the final decision made after reconsideration pursuant to subdivisions (3) and (4) of subsection (a) of section 4-181a or, if there is no mailing, within forty-five days after personal delivery of the final decision made after reconsideration pursuant to said subdivisions, or (4) within forty-five days after the expiration of the ninety-day period required under subdivision (3) of subsection (a) of section 4-181a if the agency decides to reconsider the final decision and fails to render a decision made after reconsideration within such period, whichever is applicable and is later . . . .

Thus, unless reconsideration is sought pursuant to Conn. Gen. Stat. § 4-181a, an appeal from the hearing officer's decision must be filed within 45 days of the mailing of the final decision. In practice, this means that an IDEA appeal must always be filed within 45 days, as reconsideration pursuant to Section 4-181a is impossible in an IDEA case. See id. § 4-186(g) (specifically exempting IDEA hearings from the provisions of Section 4-181a).[8] District 1's appeal would thus appear to be untimely, as that

---

[8] Section 4-186(g) states in full: "The provisions of section 4-183 shall apply to special education appeals taken pursuant to subdivision (4) of subsection (d) of section 10-76h, in the manner described therein. The final decision rendered in the special education hearings pursuant to section 10-76h shall be exempt from the provisions of

appeal was filed more than 45 days after August 10, 2006.

District 1 nonetheless challenges this result by relying on the state BOE's regulations. Conn. Agencies Regs. § 10-76h-8 states:

> A party may file a motion for clarification of the findings or decision of the hearing officer no later than 20 business days after the decision is issued, after which no such motion shall be considered by the hearing officer. The hearing officer shall have 10 business days to mail a written response to the motion. The motion to clarify shall not serve to stay the implementation of the hearing officer's decision. <u>A motion for clarification shall serve to toll the time for appeal of the hearing officer's final decision. The time to appeal shall run from the date of mailing of the decision of the hearing officer on the motion to clarify.</u>

Conn. Agencies Regs. § 10-76h-8 (emphasis added). District 1 contends that it timely filed a motion to clarify, and that the time to appeal was therefore tolled until the hearing officer mailed her written response to this motion on May 22, 2007.

One problem with the district's argument, however, is the language in the regulation stating that the "hearing officer shall have 10 business days to mail a written response to the motion." Id. Thus while the agency's regulation would seem to toll the appeal period while a motion to clarify is pending, the regulation also seems to require that the motion for clarification be decided within 10 business days. The regulation is not clear on what happens in a situation, like this one, in which the motion for clarification remains pending for more than the required 10 days. Is the appeal period

---

section 4-181a." Conn. Gen. Stat. § 4-186(g).

The parents' Motion for Reconsideration stated that it was being filed "pursuant to Conn. Gen. Stat. § 4-181a." A.R. 73 at 3. As discussed in the text, however, the parents' Motion could not have been authorized by that section. It is not clear exactly what statutory or regulatory provision, if any, permitted the parents to file their motion for reconsideration.

tolled indefinitely until the HO finally gets around to making a ruling, no matter how long she waits to do so?  Or is the appeal period tolled for only the required 10 days, after which point the clock resumes running?

The court concludes that the appeal period is tolled for only the required 10 days.  First, when faced with a conflict between the terms of the UAPA and an arguably contrary agency regulation, the Connecticut Supreme Court has been hesitant to read such a regulation as modifying the UAPA when the regulation does not "specifically address the situation posed by the facts of" the case at hand.  Comm'n on Human Rights & Opportunities v. Windsor Hall Rest Home, 653 A.2d 181, 190, 194 (Conn. 1995).  Here, the regulation's provision for tolling the appeal period would seem to conflict with section 4-183(c)'s requirement that an appeal in an IDEA case be taken within 45 days.  Putting aside the question of whether the regulation's tolling provision is even a valid exercise of administrative power in the first place, the court will not interpret an ambiguous state regulation in a way that exacerbates a conflict with the statutory language in section 4-183.

Furthermore, adopting the school district's interpretation of the regulation would allow IDEA cases to remain in limbo indefinitely if a hearing officer failed to promptly rule on motions for clarification – no matter how minor or frivolous the motion.  If this were a run of the mill administrative case, such a concern in itself would be a reason to doubt District 1's interpretation.  See id. at 187.  But this concern carries special weight in an IDEA case, where prompt resolution of the issues is of special value.  See M.D. v. Southington Bd. of Educ., 334 F.3d 217, 224 (2d Cir. 2003) ("One of the fundamental goals of the statutory scheme codified in the IDEA is to promote the expeditious

resolution of educational programming disputes."). Indeed, the Connecticut legislature seems to have been especially concerned with promptness in IDEA cases, as it exempted IDEA hearings from the statutory provision that permits parties to file motions for reconsideration. See Conn. Gen. Stat. §§ 4-181a(1)(a), 4-186(g). The BOE was plainly also concerned with promptness, as its regulation required hearing officers to respond to motions for clarification within 10 days. Taken together, these factors favor the parents' interpretation of the regulation.

District 1 nonetheless argues that, if the drafters of the agency regulation had wanted to toll the appeal period for only 10 business days, those drafters could have explicitly said so. Response to Mot. to Strike Compl. at 10. In support of its argument, the district points to Conn. Gen. Stat. § 4-183(c)(4). That statutory section deals explicitly with a contingency in which the agency fails to rule on a post-hearing motion in a timely manner, and the section clearly specifies how such a failure affects an aggrieved party's time to appeal. See id. §§ 4-181a(3); -183a(c)(4). District 1 asks the court to infer that the lack of a similar provision in the BOE's regulation reflected a conscious choice to toll the appeal period indefinitely.

The court declines to make this inference. First, the drafters of the regulation and the drafters of Section 4-183 are different entities – one is the Connecticut legislature and one is an administrative agency. This makes District 1's argument especially weak. Second, the two provisions are not even perfectly analogous. The relevant portion of Section 4-183 deals with the situation in which an agency is given two time limits (i.e. a deadline to indicate whether it will engage in reconsideration, and then a deadline for actually rendering the decision), and the agency is only untimely as

to the latter deadline.  See id.; id. § 4-181a(a).  That is quite different from the situation in this case, in which the hearing officer gave no indication, for over eight months, that she was even considering any party's motion for clarification.  The court concludes that District 1's argument is not enough to overcome the factors favoring the parents' interpretation of the regulation.[9]

Because the court concludes that District 1's appeal is untimely, the court will dismiss those aspects of District 1's Complaint that seek to appeal the hearing officer's August 10, 2006 decision.

District 1's Complaint also seeks a declaratory judgment that the parents are not prevailing parties on the issues of the 2003-2004 school year, and the summer 2004 extended school year.  Because District 1's appeal was untimely, the court dismisses District 1's claim for declaratory relief.  The parents obtained a final judgment in their favor on those issues, which makes them prevailing parties.

## III.    PARENTS' MOTION FOR PARTIAL SUMMARY JUDGMENT

In the parents' Motion for Partial Summary Judgment, they argue that they are entitled to relief on the portion of their Complaint that seeks enforcement of the HO's award to them.  Specifically, the parents seek to compel District 1 to reimburse them for J.B.'s education at Maplebrook during 2004-2005, and during the summers of 2004 and 2005.

The court denies the parents' motion, and it instead dismisses this portion of the

---

[9] District 1 also argues that its appeal must be timely because, until the hearing officer had ruled on the motions for clarification, neither party had exhausted their administrative remedies.  But District 1's argument is circular, as it assumes that the motions for clarification were still pending after the expiration of the ten day period.

parents' suit for lack of subject matter jurisdiction.[10]  Under IDEA, a party who is

> aggrieved by the findings and decision made under [20
> U.S.C. § 1415] (f) . . . shall have the right to bring a civil
> action with respect to the complaint presented pursuant to
> this section, which action may be brought in any State court
> of competent jurisdiction or in a district court of the United
> States . . . .

20 U.S.C. § 1415(i)(2)(A) (2000).  Section 1415(f) is the subsection that allows parents

the opportunity to present claims in "an impartial due process hearing, which shall be

conducted by the State educational agency . . . as determined by State law . . . ."

The problem with the parents' enforcement claim is that the parents are not

"aggrieved" by that portion of the "findings and decision" made by the HO during the

impartial due process hearing and which are the subject of the partial summary

---

[10] In connection with their partial summary judgment motion, the parents
submitted a Local Rule 56(a)(1) statement.  District 1 never filed any statement under
Local Rule 56(a)(2) contesting these facts, and at a status conference District 1 stated
that it "had no objection to the [plaintiffs' Rule 56(a)(1)] statement with respect to the
partial summary judgment.  That was a summary of fact that we did not object to."
Subsequently, when District 1 filed its cross-motion for summary judgment, the
parents opposed that motion in part by arguing that District 1's concession meant that it
had already conceded the validity of most of the parents' claims.  See Doc. No. 74 at 3-
4, 6-9, 16-18.  The defendants disputed this in a Reply they filed, see Doc. No. 75 at 3-
6, but the parents stood by their understanding of the concession in a Response.  See
Doc. No. 76 at 4-10.  District 1 then filed a Motion to Strike this aspect of the parents'
Response, and it attached a transcript of the relevant proceedings.  See Doc. No. 77.
The parents now appear to acknowledge that they may have overstated the extent of
the concessions, see Doc. No. 78 at 1, and the transcript bears this out.  Still, the
parents contend that some concessions were made.  See id. at 1-12.
To the extent that the parents' first 56(a)(1) statement contains factual
representations, the court deems those facts admitted.  However, those facts do not
change the outcome of this case because each fact either 1) helps establish a claim on
which the parents prevail even without relying on the admitted facts, or 2) is supportive
of claims that the parents lose anyway (e.g. due to a failure to exhaust, due to
prohibitions on double recovery, or due to a failure of proof on another key issue).
District 1's Motion to Strike [Doc. No. 77] is therefore **DENIED AS MOOT**.

judgment motion.  Rather, they are "aggrieved" with the steps that the state BOE has taken (or failed to take) to <u>enforce</u> the HO's decision pursuant to state law.  Nothing in IDEA authorizes the parents' enforcement suit.[11]  Accord C.C. v. Granby Bd. Of Educ., 453 F. Supp. 2d 569, 577 (D. Conn. 2006).

The parents protest that this result leaves them without a remedy.  Doc. No. 54 at 6-7.  That is simply not true.[12]  Pursuant to its statutory duty, see Conn. Gen. Stat. § 10-76h(d)(2), the state BOE began enforcement proceedings on August 25, 2006, by asking both sides to report on the status of District 1's compliance.  Six days later, the parents responded with a written request that the BOE enforce the HO's decision.  A.R. 74.  The administrative record shows that the agency received this letter on September 6, 2006.  Id.  Yet a mere two days later, without any further communication with the BOE, the parents filed this lawsuit.  Although by all indications the BOE had been prepared to act on the parents' request, the parents' lawsuit has prompted the BOE to hold its enforcement proceedings "in abeyance pending the decision" of this court.  A.R. 76.  The parents' remedy is clear: they must simply inform the BOE of this court's

---

[11] The parents conceded at oral argument that they did not assert their enforcement claim under 28 U.S.C. § 1983.

[12] In Nieves-Marquez v. Puerto Rico, 353 F.3d 108, 115-16 (1st Cir. 2003), the First Circuit concluded that IDEA did authorize an enforcement action for non-compliance.  However, the First Circuit's decision was not based on the statutory language that this court has relied on.  Instead, its rationale was based on the fact that the IDEA plaintiffs in that case would most likely have been left without any remedy if a school district refused to obey an HO's decision.  See id. at 115-16 & n.2.  This case differs from Nieves-Marquez because Connecticut state law provides the parents with a perfectly valid remedy.

decision.[13]  Id.  Accordingly, insofar as the parents' suit seeks to enforce the hearing officer's decision, that portion of the suit is dismissed.

## IV.    SUMMARY JUDGMENT STANDARD

The court next turns to the parties' cross-motions for summary judgment on the claims in the parents' Complaint.  Ordinarily, a party is entitled to summary judgment if there is no genuine issue of material fact.  See Fed. R. Civ. P. 56(c); Celotox Corp. v. Catrett, 477 U.S. 317, 322 (1986).  The moving party has the burden of showing that the material facts are not in dispute, although the non-moving party must shoulder his own burden of pointing to the evidence that would support a verdict in its favor. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 256 (1986).

The normal summary judgment standard does not, however, apply in this case. On March 26, 2007, this court held a status conference with the parties.  At that conference, both sides agreed that this case would be briefed and decided solely on the administrative record.  3/26/07 Status Conf. Tr. at 3-4, 7.   Indeed, it is standard for IDEA cases to be definitively resolved on cross-motions for summary judgment.  That is because the case is essentially an appeal from a hearing officer's decision, to be decided on the administrative record, and so the court's task on a motion for summary judgment is not really one of identifying disputed issues of material fact.  Rather, the parties' summary judgment motions provide "a 'pragmatic procedural mechanism' for reviewing a state's compliance" with IDEA.   Lillbask ex. rel. Mauclaire v. Conn. Dept. of Educ., 397 F.3d 77, 83 n.3 (2d Cir. 2005) (quoting Warton v. New Fairfield Bd. Of

---

[13] If the BOE still refused to enforce the HO's decision, the parents could presumably seek a writ of mandamus, or other such similar remedy, in state court.

<u>Educ.</u>, 217 F. Supp. 2d 261, 270 (D. Conn. 2002)).

It is less clear whether the parents' non-IDEA claims should necessarily be decided on the administrative record. Here, however, based on comments made at both the March 26 phone conference and at oral argument, the court understands both parties to have agreed to submit the <u>entire</u> case to be decided solely on the administrative record. The court further notes that neither party has demanded a jury trial on any issues.

Even if the non-IDEA claims were analyzed under traditional summary judgment principles, however, the result would be the same. As further discussed below, there are no disputed issues of material fact regarding the non-IDEA claims.

## IV.    CROSS MOTIONS FOR SUMMARY JUDGMENT

### A.    <u>Scope of the Dispute</u>

Before examining the substance of the parties' arguments, the court must first determine exactly which claims are properly before the court for resolution. That in turn requires some additional discussion of the procedural history of this case.

As noted above, on March 26, 2007, both sides agreed that this case would be briefed and decided solely on the administrative record. 3/26/07 Status Conf. Tr. at 3-4, 7. Accordingly, the court set a deadline for both parties to file cross-motions for summary judgment, and then the court set a later deadline for the parties to oppose the motions that had been filed. <u>Id.</u> at 6. The court stated that it would not allow the parties to file replies to the opposition. <u>Id.</u> The court's comments also indicated that it expected each side to set out its position in its summary judgment motion; this meant that when the parties each wrote their oppositions, they would in effect be writing

"replies" because they would have seen the other side's argument. Id. at 6-7.

In light of this, it should have been clear to the parents that, if they wished to pursue the substantive claims in their Complaint, it was their responsibility to affirmatively move for summary judgment on those claims. Despite this, the parents' cross-motion for summary judgment pursued only two claims: (1) a claim that Maplebrook was J.B.'s "stay-put" placement, and (2) a claim that District 1 violated the Rehabilitation Act during 2003-2004, and during summers 2004 and 2005. Doc. No. 66.[14]

At oral argument, the court informed the parents that it would deem them to have abandoned any claim on which they had not affirmatively moved for summary judgment. The parents objected, and upon their oral request, the court granted the parents leave to file a third motion for summary judgment, with an opportunity for the district to respond, and with an opportunity for the parents to file a Reply.

In their third summary judgment motion, the parents sought summary judgment on the following additional claims: (1) under IDEA, denial of FAPE to J.B. during 2002-2003, Summer 2003, 2004-2005, 2005-2006, and later periods; (2) violations of § 504 of the Rehabilitation Act for those same years; (3) violations of the ADA for these same years, as well as during 2003-2004, Summer 2004, and Summer 2005; and (4) the

---

[14] The school district, by contrast, moved for summary judgment on essentially all of the claims in the parents' complaint. See Doc. Nos. 64, 65. In their opposition to this motion, the parents defended a number of claims from their Complaint beyond the claims on which they had previously moved for summary judgment. See Doc. No. 74. By waiting until the filing of their opposition to press these claims, the parents prevented District 1 from having an opportunity to respond to the specific legal analyses that the parents invoked in support of these claims.

HO's failure to rule on a number of claims properly before her, in violation of a consent decree that various state officials had entered into in a different federal case.[15]  The court deems the parents to have abandoned all other substantive claims for relief.

Additionally, the court will not consider any of the parents' claims based on the 2005-2006 school year (or later).  When a party's grievances concern school actions potentially encompassed by IDEA, the party is required to exhaust its administrative remedies.  See Polera v. Bd. of Educ., 288 F.3d 478, 486-88 (2d Cir. 2002); 20 U.S.C. § 1415(l) (2000).  In this case, the parents filed their administrative complaint in February 2005, well before any IEP had been (or was required to be) proposed for the 2005-2006 school year, or for any school year beyond.  See Cerra v. Pawling Sch. Dist., 427 F.3d 186, 194 (2d Cir. 2005); 20 U.S.C. § 1414(d)(2) (requiring only that an IEP be in effect "[a]t the beginning of each school year"); id. § 1414(d)(4)(A)(I) (requiring that reviews of an IEP occur "not less than annually"); Conn. Agencies Regs. § 10-76d-11(a) (requiring only that an IEP be developed "prior to the beginning of the school year").  Although the parents raised issues about 2005-2006 and beyond in their initial presentation of the issues to the HO, their claims for those years were plainly premature, and the parents should instead have brought those claims in separate

---

[15] In connection with this supplemental summary judgment motion, the parents submitted a Local Rule 56(a)(1) Statement.  In connection with its Opposition, District 1 then submitted a Local Rule 56(a)(2) Statement.  This statement exceeds 40 pages in length.

The parents ask that District 1's statement be struck for exceeding the page length laid out in the local rules.  However, the page limit only applies to briefs and memoranda.  See Loc. Civ. R. 7(a)(2).  The court will not strike District 1's 56(a)(2) statement.

administrative proceedings (which they have apparently now done).[16]

A party surely cannot be said to have "exhausted" administrative remedies by prematurely bringing a claim to an agency. Therefore, the parents' claims based on 2005-2006 and later periods are dismissed for lack of exhaustion.[17]

B.     Stay-Put Claim

The parents first argue that the HO erred when she failed to designate the Maplebrook School as J.B.'s "stay-put" placement pursuant to 20 U.S.C. § 1415(j) (2000).[18] Section 1415(j) states: "during the pendency of any [IDEA] proceedings . . ., unless the State or local educational agency and the parents otherwise agree, the child shall remain in the then-current educational placement of such child . . . ." Id. The parents contend that, as of the time they initiated their claim with the HO, and until their dispute is finally resolved, Maplebrook School is J.B.'s "then-current educational placement" – i.e. his "stay-put" placement. Because of this, the parents seek to be

_____

[16] This conclusion extends to the parents' non-IDEA claims to the extent they are premised on denials of a FAPE. It is difficult to imagine how one could show that a proposed IEP denied a FAPE if that IEP had not yet to come into existence.

[17] The parents argue that IEPs for those time periods had in fact been proposed. See Doc. No. 78 at 8-9. However, the parents' evidence shows only that an IEP had been proposed for a period as late as Summer 2005. While there is certainly evidence that J.B.'s parents made demands for time periods beyond that, and that the school district rejected those demands, rejection of the parents' demands is not the same thing as actually proposing an IEP.
    The parents alternately argue that District 1 never proposed an IEP for 2005-2006, and that the parents should not be faulted for this. Id. at 11. But no 2005-2006 IEP was required to be proposed by the time the parents initiated their due process request in February 2005.

[18] It is not clear that the parents actually presented their stay-put claim to the HO. However, there is no exhaustion requirement for a stay-put claim. See Murphy v. Arlington Cent. Sch. Dist. Bd. of Educ., 297 F.3d 195, 199-200 (2d Cir. 2002).

reimbursed for J.B. expenses at Maplebrook from February 2005 onward.  The court agrees with the parents that Maplebrook eventually became J.B.'s stay-put placement, but it concludes that Maplebrook acquired this status only as of the date of the hearing officer's decision.[19]

To understand the parents' claim, some additional background about IDEA is helpful.  Under IDEA, states that receive certain federal grants (including Connecticut) are required to provide disabled children with a FAPE.  20 U.S.C. § 1412(a)(1)(A) (2000).  Procedurally, this is accomplished by having parents and school administrators jointly develop an IEP for each year of the student's education.  Polera, 288 F.3d at 482.  An IEP is memorialized in writing, and it sets forth the specific elements that will be included in the child's education during the coming year.

If an IEP does not provide a FAPE, and the parents wish to remedy this by sending their child to private school at public expense, IDEA provides the parents with two remedial mechanisms.  The first of these is reimbursement, which is set in motion when the parent unilaterally enrolls the student in private school.  The parents then sue, and they are reimbursed for their expenses in a given year if the court agrees that the IEP for that year denied a FAPE, and that the private school placement was appropriate.[20]  See Sch. Comm. of Burlington v. Dep't of Educ., 471 U.S. 359, 369-70 (1985); Gagliardo v. Arlington Cent. Sch. Dist., 489 F.3d 105, 111-12 (2d Cir. 2007).  In

---

[19] Because the HO never ruled on the parents' stay-put claim, the court need not apply any deference to the HO's decision – there is simply nothing to defer to.

[20] District 1 does not challenge the HO's conclusion that Maplebrook provided an appropriate placement for J.B.

this case, the HO denied the parents' request for reimbursement for 2004-2005 because she concluded that District 1's IEP for that year provided a FAPE.

The second IDEA remedy is compensatory education, which is designed to compensate a student who was actually educated under an inadequate IEP. Compensatory education is a prospective award of educational services designed to catch-up the student to where he should have been absent the denial of a FAPE. <u>See Reid ex. rel. Reid v. District of Columbia</u>, 401 F.3d 519, 522 (D.C. Cir. 2005); <u>Burr v. Ambach</u>, 863 F.2d 1071, 1078 (2d Cir. 1988), <u>vacated and remanded sub. nom. Sobol v. Burr</u>, 492 U.S. 902 (1989), <u>reaff'd after remand</u> 888 F.2d 258 (2d Cir. 1989).[21]  In this case, the HO concluded that J.B. was deprived of a FAPE during his 2003-2004 school year at HVRHS.  Accordingly, the HO awarded one year of compensatory education at Maplebrook to make up for the harm to J.B.'s education.  The HO specifically identified the 2004-2005 school year at Maplebrook as J.B.'s "compensatory" year.  Because the parents had already paid J.B.'s Maplebrook tuition for 2004-2005, the HO concluded that District 1 was required to compensate the parents for the amount they had spent on that year.

Awards of compensatory education and reimbursement are both awards that are given at the end of a long litigation battle.  But before the litigation ends, both sides must figure out exactly where to place the student during the pendency of a dispute.

---

[21] Compensatory education is not specifically mentioned in IDEA's statutory language.  Nonetheless, most circuits -- including the Second Circuit -- have concluded that IDEA authorizes this award.  <u>See Burr</u>, 863 F.2d at 1078.  These circuits reason that reimbursement is only an effective remedy when the parents can afford to front the costs of private education pending judicial resolution, and so an alternate remedy is needed to assist parents of more modest means.  <u>See, e.g., id.</u>

This is where the "stay-put" provision comes in: it tells the parties to maintain the status quo until potentially lengthy administrative proceedings have run their course. See Burlington, 471 U.S. at 373; Zvi D. v. Ambach, 694 F.2d 904, 906 (2d Cir. 1982).

In its most common application, the stay-put provision simply prevents the school district from unilaterally excluding a disabled child in response to a dispute. See Honig v. Doe, 484 U.S. 305, 327 (1988). But in some circumstances, the stay-put provision requires that the child be placed in a private setting. In those cases, the parents are entitled to reimbursement for their expenses, even if the parents are unsuccessful in their claim for reimbursement based on a denial of a FAPE. See Mackey v. Bd. of Educ. for the Arlington Cent. Sch. Dist., 386 F.3d 158, 160-61 (2d Cir. 2004). The key inquiry in this case is thus to determine if and when Maplebrook became J.B.'s stay-put placement.

Generally, the stay-put placement will be the placement that was in effect at the time of the student's last-implemented IEP. See id. at 163 (collecting cases). Here, that was J.B.'s 2003-2004 placement at HVRHS, and so District 1 contends that J.B.'s stay-put placement was at HVRHS. Doc. No. 71 at 12.

District 1 is correct insofar as it is referring to J.B.'s proper placement at the commencement of administrative proceedings. However, a student's stay-put placement can change once the parents persuade an HO that the district's IEP is inadequate. This is because the state and the parents are free to agree on an alternate stay-put placement, see 20 U.S.C. § 1415(j); 34 C.F.R. § 300.514(a) (2006), and an administrative decision upholding a unilateral placement is a qualifying "agreement" by the state. Mackey, 386 F.3d at 163; Bd. of Educ v. Schutz, 290 F.3d 476, 484 (2d Cir.

31

2002).  Indeed, federal regulations specifically provide that, "[i]f the decision of a hearing officer in a due process hearing . . . agrees with the child's parents that a change of placement is appropriate, that placement must be treated as an agreement between the State . . . and the parents for purposes of" the stay-put provision.  34 C.F.R. § 300.514(a) (2006).  Because the HO concluded that J.B. should be educated at Maplebrook for 2004-2005 (and for summers 2004 and 2005), Maplebrook became J.B.'s stay-put placement as of the date of the HO's decision.[22]

District 1 responds by claiming that the HO did not actually order that J.B. be placed at Maplebrook; it characterizes the HO's award as merely an "equitable remedy for the parents [that] provid[es] them with a cash payment for the cost incurred for the 2004-2005 school year[, and] that had no legal affect on J.B.'s placement for the 2004-2005 school year."  Doc. No. 71 at 17.  The district further points out that the compensatory award in this case stands in contrast to the reimbursement awards that previous cases have deemed sufficient to constitute a change in placement for "stay-put" purposes.  See, e.g., Mackey, 386 F.3d at 161; Schutz, 290 F.3d at 478.[23]

---

[22] Although the parents at times suggest that Maplebrook was J.B.'s "stay-put" placement throughout the entirety of this dispute, it is clear that the state did not "agree" to placement at Maplebrook until August 10, 2006.  As neither side argues that the HO's August 2006 decision was issued too late, cf. Mackey, 386 F.3d at 163-66, the date of the HO's decision is controlling.  See id. at 164-65.

[23]  To the extent that District 1 argues that an award of monetary damages is not equivalent to a change in placement, the court rejects this argument.  It is true that this argument appears to find traction in 1982 case from the Second Circuit.  See Zvi D., 694 F.2d at 908 ("Payment and placement are two different matters.").  However, the Second Circuit has retreated from this position, noting that it is inconsistent with more recent versions of the IDEA regulations, as well as with Supreme Court case law.  See Schutz, 290 F.3d at 483 n.7.  In any event, the Second Circuit has interpreted Zvi D. as referring to payments brought about by a stipulation agreement, rather than payments

Although the HO's award was one of compensatory education, it is plain that she understood her decision to be one that specifically approved of J.B.'s placement at Maplebrook for the 2004-2005 school year. See A.R. 1 at 18-19 (evaluating whether Maplebrook School provides an appropriate placement for J.B.). That is all that matters. Indeed, the relevant federal regulation does not distinguish between placement changes effected by compensatory education awards and those effected by reimbursement awards. See 34 C.F.R. § 300.514(a) (2006). To nonetheless import such a distinction would lead to the anomalous conclusion that J.B.'s stay-put placement is one based on an IEP that both the state and the parents agree to be inappropriate.

Nor does it matter that the HO concluded that the 2004-2005 IEP was appropriate. See Mackey, 386 F.3d at 160-61 (explaining that the stay-put provision reflects a congressional choice "that all handicapped children, regardless of whether their case is meritorious or not, are to remain in their [stay-put] placement until the dispute with regard to their placement is ultimately resolved" (internal quotation marks omitted) (quoting Susquenita Sch. Dist. v. Raelee S. ex rel. Heidi S., 96 F.3d 78, 83 (3d Cir. 1996))). Here, the validity of the 2004-2005 IEP remained in dispute even after the hearing officer issued her decision; it would be anomalous to use this disputed IEP as the "stay-put" placement since the dispute over this IEP was what triggered the stay-put provision in the first place.

The court accordingly concludes that Maplebrook constitutes J.B.'s stay-put

---

that result from an administrative finding that a FAPE was denied. See id.

placement from August 10, 2006, onward. District 1 is ordered to reimburse J.B.'s tuition at Maplebrook from that date through the date that the parents' dispute over the 2004-2005 school year is no longer pending (or the date that there is a new agreement over J.B.'s placement, if such an agreement occurs first).[24]

C.   Alleged FAPE Denials

The parents' next set of claims suggest that J.B. was denied a FAPE during the 2002-2003 school year, Summer 2003, and the 2004-2005 school year. The parents seek an award of compensatory education for the former two periods, and a reimbursement award for the latter period. The HO did not issue a timely ruling regarding the parents' Summer 2003 claim. The HO rejected the parents' claim for the other two time periods.

In considering the parents' claims, the court must be mindful that judicial review of the administrator's decision is "strictly limited." D.F. v. Ramapo Cent. Sch. Dist., 430 F.3d 595, 597-98 (2d Cir. 2005). This reflects the expectation that federal courts will give "due weight to [administrative] proceedings, mindful that the judiciary generally lacks the specialized knowledge and experience necessary to resolve persistent and difficult questions of educational policy." Walczak v. Florida Union Free Sch. Dist., 142 F.3d 119, 129 (2d Cir. 1998) (internal quotation marks omitted).

Apart from any considerations of administrative deference, however, there is a separate question of which side has the burden of proof in establishing its claims. As a

---

[24] It is irrelevant that the 2004-2005 school year has already been completed; what matters is that the dispute over that year is still ongoing. See Zvi D., 694 F.2d at 908.

general matter, the parents have the burden of proof when they file for a due process hearing.  See Schaffer ex rel. Schaffer v. Weast, 546 U.S. 49, 51 (2005).  But it is not clear if that general rule holds true when state law specifically allocates the burden of proof to the school district.  See id. at 61.

Connecticut falls into this grey area.  See Conn. Agencies Regs. § 10-76h-14(a) (stating that in a due process hearing "the public agency has the burden of proving the appropriateness of the child's program or placement, or of the program or placement proposed by the public agency").  The court finds persuasive Justice Breyer's analysis in Schaffer (which the Supreme Court majority did not address given its disposition of the case), which concluded that IDEA's model of cooperative federalism did not intend to preempt states' abilities to determine the burden of proof for themselves.  See Schaffer, 546 U.S. at 67-71 (Breyer, J., dissenting).  Thus, in light of Connecticut law, District 1 bears the burden of proving the appropriateness of its IEPs by a preponderance of the evidence.

Even under Connecticut law, however, the parents retain the burden of production.  Conn. Agencies Regs. § 10-76h-14(a).  This means that the parents retain the obligation to come forward with evidence in support of their claim that District 1 denied J.B. a FAPE during a given period.

When a party asserts that a particular IEP denied a FAPE, the court must apply the two-part inquiry under Board of Education of the Hendrick Hudson Central School District v. Rowley, 458 U.S. 176 (1982).  First, the court must determine whether the school district has complied with IDEA's procedural requirements in developing that IEP.  See id. at 206.  Second, the court must determine if the IEP is "reasonably

calculated to enable the child to receive educational benefits."  Id.  If the IEP fails either

prong of the Rowley test, the school has not met its statutory obligation to provide a

FAPE.  See Cerra v. Pawling Cent. Sch. Dist., 427 F.3d 186, 192 (2d Cir. 2005).

   If an IEP is deficient along one or more prongs of the Rowley test, however,

that does not automatically mean that the parents are entitled to a remedy.  This is

especially true with regards to the procedural prong.  Because the remedies of

reimbursement and compensatory education are essentially equitable ones, see Frank

G. v. Bd. of Educ. of Hyde Park, 459 F.3d 356, 363-64 (2d Cir. 2006); Mrs. C. v.

Wheaton, 916 F.2d 69, 75 (2d Cir. 1990), courts will grant relief for procedural flaws

only when those flaws actually affect a child's educational opportunity.  See J.D. ex rel.

J.D. v. Pawlet Sch. Dist., 224 F.3d 60, 69 (2d Cir. 2000); Burke County Bd. Of Educ. v.

Denton, 895 F.2d 973, 982 (4th Cir. 1990).  Additionally, when parents seek a

reimbursement remedy following their unilateral placement in private school, that

remedy may only be awarded if the private placement is deemed "appropriate."

Burlington, 471 U.S. at 369-70; Gagliardo, 489 F.3d at 111-12.

   In evaluating the parents' various claims regarding denial of FAPE, the court will

consider each relevant time period separately.

   1.   *Compensatory Education Request for 2002-2003*

   The parents attack the 2002-2003 IEP on both the procedural and substantive

prongs.

   On the procedural front, parents first contend that J.B.'s 2002-2003 IEP was not

based on an evaluation that had been conducted within the preceding three years.

Pursuant to 20 U.S.C. § 1414(a)(2), school districts must conduct a comprehensive

evaluation of disabled children every three years – a so-called "triennial evaluation." The parents claim that J.B.'s IEP was developed on April 26, 2002, and that as of that date the most recent triennial evaluation had been an April 1998 evaluation conducted by Boston Children's Hospital ("BCH Evaluation").  Doc. No. 85 at 2.

It is true that the 2002-2003 IEP was first proposed on April 26, 2002.  See Hearing Exh. B-7.  But as District 1 correctly points out, the IEP was not actually finalized until a PPT meeting on May 31, 2002.  Hearing Exh. B-9 at 2.  That second meeting occurred after J.B. was the subject of a triennial evaluation by school psychologist Hal Tingley in early May 2002.  See Hearing Exh. B-8.  And the May 31 IEP states that it was implementing the April IEP because the results of the Tingley evaluation supported that decision.  Id. at 2.  Thus, even if District 1 waited more than three years to conduct a reevaluation of J.B., it did reevaluate him shortly before it formally implemented the 2002-2003 IEP.  Any delay in testing did not affect J.B.'s educational opportunities, and the parents are not entitled to relief for this alleged procedural violation.

The parents next argue that the Tingley evaluation was insufficiently comprehensive.  Under IDEA, a triennial evaluation must "use a variety of assessment tools and strategies to gather relevant functional and developmental information . . . that may assist in determining . . . the content of the child's [IEP]."  20 U.S.C. § 1414(b)(2)(A).  The tests may not rely on only "a single procedure as the sole criterion" for determining the appropriate IEP.  Id. § 1414(b)(2)(B).  Additionally, the

student must be tested "in all areas of suspected disability." Id. § 1414(b)(3)(C).[25] The

parents contend that these requirements were not met because the Tingley evaluation

included only cognitive and achievement tests. Doc. No. 85 at 5. Based on

deficiencies identified in the 1998 BCH evaluation, the parents believe that Tingley also

should have evaluated J.B.'s motor skills, speech/language skills, social/emotional

skills, pragmatic skills, visual abilities, vocational/life skills, and adaptive behavior. Id. at

9.

The HO appears to have rejected the parents' argument as time-barred. A.R. 1

at 14. This conclusion was based on the fact that the allegedly improper evaluation

occurred in May 2002, more than two years before the parents requested a due

process hearing. See Conn. Gen. Stat. § 10-76h(a)(3) (2002) (current version at Conn.

Gen. Stat. § 10-76h(a)(4) (2007)) (setting a two-year statute of limitations for IDEA

claims); M.D., 334 F.3d at 221-222 (holding that in an IDEA case, state law sets the

relevant limitations period).

The HO's conclusion was correct. Without citing any authority, the parents argue

that their claim is timely because it was used as a basis for the 2002-2003 IEP. Doc.

No. 85 at 2-3. But that is beside the point. Federal law determines the timing of when

an IDEA claim accrues, and the relevant question is when the plaintiffs "knew or had

reason to know" of the allegedly improper conduct. See M.D., 334 F.3d at 221. Here,

although the parents chose not to attend the May 31, 2002 PPT meeting, they were

---

[25] Connecticut and federal regulations, and Connecticut statutes, contain
materially similar requirements. See 34 C.F.R. § 300.532 (2002); Conn. Gen. Stat.
§ 10-76ff; Conn. Agencies Regs. § 10-76d-9.

aware that the May 31 meeting was going to review the results of the Tingley evaluation

and assess its impact on J.B.'s IEP.  See Hearing Exh. B-8 at 1.  That IEP was then

mailed to parents after the May 31 meeting, and it clearly stated that the Tingley

evaluation had examined J.B. only in the cognitive and achievement areas.  See id. at

2.  Thus, as of May 31, 2002, or shortly thereafter, the parents knew or had reason to

know of the essential aspects of the Tingley evaluation and its impact on the 2002-2003

IEP.  The parents' improper evaluation claim is time barred.[26]

Even if this claim were not time barred, however, the court concludes that it still

is insufficient to entitle the parents to relief.  The HO concluded that there was

"adequate information and psychological recommendations to plan a program for the

child. . . .   The results of all of the child's evaluations have remained fairly consistent

. . . ."  A.R. 1 at 14.  The HO also pointed out that the TOTAL program implemented

most of the recommendations from the comprehensive BCH evaluation, and that the

---

[26] One might argue that District 1 waived the statute of limitations defense by failing to raise the defense in its Answer.  See Nat'l Mkt. Share, Inc. v. Sterling Nat'l Bank, Inc., 392 F.3d 520, 526 (2d Cir. 2004) (stating that failure to plead an affirmative defense, such as statute of limitations, will usually operate as a waiver).  However, an issue not raised in the pleadings can be tried by "express or implied consent of the parties."  Fed. R. Civ. P. 15(b).  This rule extends to affirmative defenses.  See Nat'l Mkt. Share, 392 F.3d at 526.

In this case, the court deems the parties to have impliedly consented to allowing the statute of limitations issue to be preserved as it relates to the allegedly improper evaluation.  As an initial matter, because the parents' claim is essentially an appeal from the HO's decision, rather than an entirely fresh action, the parents were certainly on notice that the HO had based part of her ruling on the statute of limitations.  More importantly, District 1 defended the HO's conclusion in its Summary Judgment Motion, see Doc. No. 65 at 19, while the parents' contested the HO's statute of limitations finding in their Summary Judgment Motion, see Doc. No. 85 at 4.  At no point have the parents suggested that District 1 waived the statute of limitations defense as it pertains to this issue.

program included the kind of self-contained environment favored by the June 2003 evaluation.  See A.R. 1 at 3, 11.  The HO thus appears to have concluded that J.B.'s placement in 2002-2003 would have been the same even if Tingley had conducted a more comprehensive evaluation.

This conclusion is well-supported by the evidence in the record.  The picture that emerges from the 1998 BCH evaluation is not significantly different from the picture that emerges from the 2002 Tingley evaluation, coupled with a later June 2003 comprehensive evaluation.  See Hearing Exh. P-5, Hearing Exh. B-8 Hearing Exh. B-13; see also Parents' 10/18 56(a)(1) Stat. at ¶ 25, 27.  Record evidence also demonstrates that the TOTAL program implemented most of the BCH recommendations.  Compare Hearing Exh. P-5 at 11-16 (listing the BCH recommendations) with 7/8/05 Hearing Tr. at 65-66 (testimony of occupational therapist), 7/12/05 Hearing Tr. at 60-64, 69-73 (testimony of TOTAL teacher), 7/22/05 Hearing Tr. at 91-94 (same), and Hearing Exh. B-7 at 33 (listing the modifications and adaptations in J.B.'s IEP).

Tellingly, it was J.B.'s parents who pushed District 1 to keep J.B. in the self-contained TOTAL program during 2002-2003.  See District 1's 56(a)(1) Stat. at ¶ 11; see also Parents 56(a)(2) Stat. at ¶ 11 (failing to provide record citations to dispute this).  There is no reason to think that a different evaluation would have produced a

different placement in 2002-2003.[27]  Accordingly, there is no basis to upset the HO's conclusion that any deficiencies in the Tingley evaluation did not impact J.B.'s educational opportunities.

The parents remaining "procedural" challenges[28] for 2002-2003 are really more like substantive concerns.  Of these challenges, the ones that could even arguably be said to have a procedural component are the parents' claims that: (1) the IEP did not contain objectively measurable goals, and (2) the IEP did not provide for an appropriate

---

[27] The parents briefly suggest that a "proper" evaluation would have shown that J.B. experienced elevated levels of anxiety while participating in the TOTAL program. Doc. No. 85 at 11-12.  The parents further claim that a June 2003 independent evaluation of J.B. confirmed the existence of this anxiety.  See id.

In citing to the June 2003 evaluation, the parents did not comply with the specific citation requirement of the local rules.  See Loc. R. Civ. P. 56(a)(1) ("Each statement of material fact must be followed by a specific citation . . . . [This] . . . requires counsel . . . to cite to specific pages when citing to deposition or other transcripts or to documents longer than a single page in length.")  The relevant evaluation is a 10-page document, single-spaced, and the parents do not provide a citation to the page which attributes elevated anxiety levels to participation in TOTAL.  See Hearing Exh. P-39; Parents' Third 56(a)(1) Stat. at ¶¶ 9, 24.  It is not clear to the court exactly what portion of the evaluation supports the parents' claim.

The parents also cite to the evaluator's testimony.  See Doc. No. 85 at 12.  This testimony also does not specifically attribute increased anxiety to J.B.'s participation in TOTAL.

In any event, the parents themselves argue that reports of anxiety were present in the BCH evaluation, as well as in the later 2003 evaluation.  Parents' Third 56(a)(1) Stat. at ¶ 27.  Both the parents and District 1 agreed to previous placements in the TOTAL program at a time when the BCH evaluation was the most recent evaluation on record.  A more comprehensive evaluation in 2002 would not have displaced this agreement.

[28] These "procedural" challenges, as well as the parents' substantive challenges for 2002-2003, may well be time barred.  However, no party has raised statute of limitations arguments in relation to these issues.

transition plan.[29]  Both of these arguments were addressed to the HO only in a very

skeletal manner, see Parents' Post-Hearing Br. at 20-22, 32, and the HO did not

address the former of these two arguments in her written ruling.

There is no merit to the parents' contention that the IEP did not contain

objectively measurable goals.  Pursuant to 20 U.S.C. § 1414(d)(1)(A)(ii), each IEP must

contain "a statement of measurable annual goals, including benchmarks or short term

objectives," related to a student's educational needs.[30]  The 2002-2003 IEP contains a

number of such measurable annual goals, with short term benchmarks.  See Hearing

Exh. B-7 at 6-29.  Although some goals are perhaps not as measurable as others, the

IEP certainly meets the minimum statutory standards.  Indeed, aside from several

conclusory allegations that the annual goals were too vague, Doc. No. 85 at 3, 14, the

parents have not really explained why they view the listed goals and benchmarks as

deficient.

There is also no merit to the parents' contention that the IEP lacked a transition

plan.  See 20 U.S.C. § 1414(d)(A)(vi)(I) (requiring IEPs to contain "a statement of the

_____

[29] The other "procedural" claims that the parents have raised are: (1) the IEP did
not provide programming in all areas of J.B.'s disability, (2) the IEP did not provide for a
plan to enable J.B. to transition to the ninth grade at HVRHS, and (3) the IEP did not
provide any services during Summer 2003.  Doc. No. 85 at 3.  Summer 2003 is
discussed in a separate subsection.

[30] The parents also cite several statutory provisions that appear to have nothing
to do with their claim about lack of objective criteria.  See Doc. No. 85 at 3 (citing 20
U.S.C. §§ 1401, 7703, 7705, 7713, and 37 U.S.C. § 101).  They also cite a regulation,
34 C.F.R. § 222.50 (2002), but that regulation merely provides definitions for the CFR
subpart governing disbursement of federal aid payments to states.  The regulations that
actually impose substantive requirements on local school districts are found at 34
C.F.R. §§ 300.340 to 300.350 (2002).  34 C.F.R. § 300.347(a)(2) (2002) echoes the
statute in requiring the IEP to contain "measurable annual goals."

transition service needs of the child"). A transition plan is supposed to help prepare a student for his post-educational career. In accordance with this, J.B.'s IEP states that his transition plan during 2002-2003 will be to "explore pre-vocational skills through his special education program." Hearing Exh. B-7 at 5. Indeed, the TOTAL program contained instruction on various life-skills activities. See 7/12/05 Hearing Tr. at 85-87; 9/6/05 Hearing Tr. at 144-45.

It is clear that the IEP had a transition plan; the parents' real complaint is that the plan was inappropriate because relatively little instruction was offered in this area. In this regard, the parents' complaint is more substantive than procedural. The HO recognized that the IEP "subordinated" transition goals to other educational concerns, as a more comprehensive vocational curriculum was only available at the high school. Nonetheless, the HO concluded that a more intensive transition plan would have been disruptive to J.B.'s other areas of needed progress, as it would have required him to be removed from the TOTAL program for part of the day. A.R. 1 at 15. This is the sort of education policy judgment that the court is not inclined to overturn. The court defers to the reasoned decision of the HO.

The court next turns to the parents' other substantive claims regarding the 2002-2003 IEP. The parents suggest that the IEP did not provide J.B. with a FAPE because, among other things, it did not contain programming in all areas of J.B.'s disability, did not contain appropriate goals and objectives, and resulted in academic regression. See Doc. No. 85 at 3-4. The parents believe that the 2002-2003 IEP fell well short of what J.B. needed.

The substantive prong of Rowley asks whether the IEP is "reasonably calculated

43

to enable the child to achieve educational benefits." 458 U.S. at 206-07. This does not mean that the school district must provided the best education possible; an IEP can satisfy IDEA even if it falls short of maximizing a student's potential. Walczak, 142 F.3d at 130. The baseline question is simply whether the IEP is likely to produce a meaningful level of progress. Id. To answer that question, the court "must examine the record for any 'objective evidence' indicating whether the child is likely to make progress or regress under the proposed plan." Id. This evidence can include such things as grades and test scores, although the ultimate inquiry must be tailored to the individual student's disability and specific educational placement. Mrs. B. v. Milford Bd. of Educ., 103 F.3d 1114, 1120-21 (2d Cir. 1997).

The HO found that J.B.'s placement in TOTAL was reasonably calculated to enable the student to achieve educational benefits. She observed that the elements of the TOTAL program incorporated many of the recommendations set out in the BCH evaluation. A.R. 1 at 3. She also pointed out that a comparison of J.B.'s evaluations from the beginning of the school year and the end of the school year "establish that the child made a reasonable amount of progress and benefitted from the [TOTAL] program." A.R. 1 at 15. Based on this, the HO concluded that the 2002-2003 IEP was substantively appropriate.

The court finds no basis for overturning the HO's decision. "An assessment of educational progress is a type of judgment for which the district court should defer to the [HO's] educational experience, particularly where . . . the district court's decision is based solely on the record that was before the [HO]." M.S. v. Yonkers Bd. of Educ., 231 F.3d 96, 105 (2d Cir. 2000). A review of J.B.'s evaluations shows that J.B.

mastered a number of goals from his IEP, and that he made satisfactory progress on a number of others. See Hearing Exh. B-7 at 6-29. Although J.B.'s progress in Math was rather weak, he made a decent amount of progress in science, social studies, reading, writing, and spelling, as well as in developing various behavioral and organizational skills. See id. It may well be the case that the goals in J.B.'s IEP could have been more finely tailored to J.B.'s needs, and more objectively defined. Nonetheless, IDEA requires only a certain baseline level of adequacy, and the HO quite reasonably concluded that this baseline was met. Indeed, the HO's conclusion is reinforced by evidence, discussed above, that the TOTAL program largely implemented the BCH recommendations, recommendations that the parents' believe were still appropriate for J.B.

The parents nonetheless challenge the HO's conclusion by arguing that J.B. did not make very much progress at all in 2002-2003, and they point to the testimony of J.B.'s 2003-2004 special education teacher. That teacher, Birgid Somers, testified that when J.B. came to her, he had difficulty understanding what he read (although his actual decoding of the words was quite strong). 8/10/05 Hearing Tr. at 17. She also testified that he had trouble writing dates numerically, that he could not write his name in cursive, that he had a hard time writing sentences, and that he had difficulty with a number of basic math concepts. Id. at 18, 66-79, 119-20.

This testimony is not sufficient to overcome the HO's conclusion. First, Somers also testified that at the time J.B. came to her in Fall 2003, several of his skills were at a level higher than what was reflected in the May 2002 Tingley evaluation. Id. at 82-86. This suggests that J.B. did make at least some progress during 2002-2003. Second,

Somers's testimony was consistent with the HO's conclusion: while J.B. perhaps had regressed on some of the tasks he was listed as mastering in June 2003, that does not mean that J.B. made no progress with regard to other tasks. Third, Somers's testimony does not undermine the HO's conclusion that the 2002-2003 IEP implemented many of the recommendations from the BCH evaluation.

The parents also ask the court to draw a negative inference, which they argue the HO should have drawn, from the fact that District 1 never produced Hal Tingley as a witness to testify as to the appropriateness of the 2002-2003 IEP. Even assuming that the HO could properly draw such an inference, she certainly was not required to do so. To the extent that the parents request the court to draw a similar inference, the court declines to do so, in part because the court is unaware of any reason why the parents did not themselves call Tingley if his testimony would have been favorable to them. Additionally, District 1 simply may have declined to call Tingley because it was aware that his evaluation was not sufficiently comprehensive. There is little basis to conclude that Tingley's testimony would have established the substantive inadequacy of the IEP.

The HO concluded that J.B. was not denied a FAPE during 2002-2003. The court sees no basis to overturn this decision. The parents' challenge for that school year fails.

2.    *Compensatory Education Request for Summer 2003*

The parents next claim that J.B. was denied a FAPE for Summer 2003 because District 1 provided no academic content for that summer. Although the HO's clarified decision agreed with the parents on this claim, the court has already found that the clarified decision was a nullity. The HO's original decision did not directly address the

parents' Summer 2003 claim.

IDEA does not automatically require school districts to provide school services in the summer. Rather, such services must be provided only if they "are necessary for the provision of FAPE to the child." 34 C.F.R. § 300.309 (2002). In deciding whether or not extended school year services are required, courts often focus on whether or not a student is likely to regress during the summer break. See, e.g., Johnson ex rel. Johnson v. Indep. Sch. Dist. No. 4, 921 F.2d 1022, 1027-30 (10th Cir. 1990).

Despite the fact that the parents have a burden of production, they cite to absolutely no evidence in the record to specifically support their claim that J.B. required Summer 2003 programming.[31] They also do not attempt to identify a legal standard for when extended school year services are appropriate, and thus they certainly do not indicate which facts in the record suffice to meet this legal standard. Instead, the parents merely assert that the failure to provide J.B. with programming during Summer 2003 constituted a denial of FAPE. See Doc. No. 85 at 14, 16. That is insufficient to carry their burden of production. It is doubly insufficient in light of this court's explicit instruction at oral argument that the parents were to marshall record evidence in support of their claims of denial of FAPE.

---

[31] The parents purport to rely on the HO's Finding of Fact # 33, which stated that "an academic program is necessary to avoid regression." A.R. 1 at 10. As an initial matter, the HO's analysis is not itself record evidence in support of a claim. Additionally, it is clear from the context that the HO was referring to Summer 2004, not Summer 2003. Indeed, the HO elsewhere concluded that because the child regressed during Summer 2003, this should have triggered a discussion about extended school year services for Summer 2004. See A.R. 1 at 17. The HO (and the parents) never discuss what record evidence should have alerted the PPT team to the possibility of such regression prior to Summer 2003.

*3.      Reimbursement Request for 2004-2005*

The parents also claim that J.B.'s IEP for 2004-2005 could not provide FAPE, and they therefore seek to be reimbursed for the tuition they spent at Maplebrook during that year.  The parents assert claims under both the substantive and procedural prongs of Rowley.  The HO did not directly address the parents' procedural claims for this year (which were argued to the HO in a rather skeletal manner, see Parents' Post Hearing Br. at 24, 32).  The HO rejected the parents' substantive claims.

The parents' first procedural claim relates to the 2002 Tingley evaluation.  They again press their view that the evaluation was not sufficiently comprehensive, and they contend that J.B.'s 2004-2005 IEP was defective because it was still based on the Tingley evaluation.  See Doc. No. 85 at 26.

As an initial matter, this claim would appear to be time barred for the same reason that the parents' previous claim about the Tingley evaluation is time barred.  Even if the claim is not time barred, the court concludes that the claim fails.  Records from the June 10, 2004 PPT meeting reveal that the PPT team relied on a variety of tests more recent than the Tingley evaluation.  See Hearing Exh. B-25 at 4.  In particular, the team relied on a cognitive examination dated June 2003 (which presumably refers to the comprehensive June 2003 independent evaluation that the parents obtained), a motor skills evaluation dated March 2004, an adaptive behavior assessment dated April 2004, and a speech and language assessment dated May 2004.  See id.; Hearing Exh. B-13; Hearing Exh. B-16; Hearing Exh. B-21; Hearing Exh. B-22.  There is no indication that the combination of these evaluations was not sufficiently comprehensive so as to meet the district's IDEA obligations.

48

The parents take the position that none of these evaluations was actually used to develop J.B.'s IEP. They assert that the IEP was actually developed at the April 19, 2004 PPT meeting, or shortly thereafter, while the results of most of these evaluations were not made available to the PPT until the June 10, 2004 meeting itself. See Doc. No. 85 at 23-26. The parents point out that District 1 showed up on June 10, 2004, with an IEP already drafted, and that the draft was not altered after the PPT received the various reports. See id. at 26.

This does not suffice to establish a procedural violation. IDEA simply requires the school district to review evaluation results in developing an IEP. See 20 U.S.C. § 1414(d)(3)(a)(2). That was done here: the district came to the PPT meeting with a draft IEP, it looked at the new evaluation data, and it concluded that its draft IEP was appropriate. Cf. T.S. v. Bd. of Educ., 10 F.3d 87, 89 (2d Cir. 1993) (finding that an outside evaluation was appropriately "considered" by a PPT when it was read at a meeting, but not distributed to PPT members prior to the meeting). Nothing in IDEA requires the district to change its initial views of what is appropriate after it reviews new evaluation data.

The parents next assert that District 1 committed procedural violations because it improperly "decided" to reject the parents' private placement at some point prior to the PPT meeting. The parents claim that this violated the requirements of 34 C.F.R. § 300.552, see Doc. No. 85 at 19, which states that placement decisions must be made "by a group of persons, including the parents, and other persons knowledgeable about the child, the meaning of the evaluation data, and the placement options. 34 C.F.R.

§ 300.552 (2002).[32]

This claim is without merit. When the PPT met on June 10, 2004, the team included school officials, J.B.'s mother, the parents' independent psychologist, a speech and language expert, a physical therapist, an occupational therapist, J.B.'s special education teacher, and one of J.B.'s regular education teachers. Hearing Exh. B-25 at 1. Meeting minutes reveal that the team listened to a variety of expert reports and then reviewed the draft IEP. See id. at 2. Although J.B.'s mother and the independent psychologist did not approve the IEP, the rest of the PPT members concluded that the IEP was appropriate. Id. The PPT team also rejected the parents' request to place J.B. at Maplebrook. Id. Contrary to the parents' suggestion, J.B.'s placement decision was made by an appropriate group and in compliance with 34 C.F.R. § 300.552. Cf. G.D. v. Westmoreland Sch. Dist., 930 F.2d 942, 947-948 (1st Cir. 1992) (finding no violation of § 300.552 where an individual drafted an IEP beforehand, and the placement team then adopted the draft at a placement meeting).

The parents also claim that the PPT team erred procedurally by failing to consider, in good faith, the parents' requested placement at Maplebrook. Doc. No. 85 at 19. The parents take issue with the fact that a representative from Maplebrook did not attend either the April 19, 2004 meeting or the June 10, 2004 meeting. Id. at 20. The parents complain that District 1 never actually compared the merits of the Maplebrook program to the merits of the proposed IEP, and that it rejected Maplebrook

_____

[32] The parents also cite 20 U.S.C. § 1412(a)(5), but that statute simply requires schools to educate disabled children in the least restrictive environment available. This has nothing to do with PPT decisions and timing.

solely because it concluded that the proposed IEP was itself appropriate.  See id. at 24.

These complaints fall short of the mark.  As an initial matter, the parents err in assuming that District 1 was required to consider placement at Maplebrook with the level of depth that the parents sought.  Under IDEA, school districts must educate students in the least restrictive placement that provides a FAPE.  See 20 U.S.C. § 1412(a); 34 C.F.R. § 300.550 (2002); Walczak, 142 F.3d at 122.  That is, IDEA prefers that students be mainstreamed to the fullest extent possible.  Walczak, 142 F.3d at 122.  Because of this preference, districts are free to discuss alternatives sequentially, from least restrictive to most restrictive.  See G.D., 930 F.2d at 948.  Thus, once the PPT concluded that the draft IEP was appropriate, it was free to reject the more restrictive placement at Maplebrook without further consideration.  Indeed, J.B.'s IEP reflects that the PPT rejected placement at Maplebrook because it was not the least restrictive appropriate placement available.  See Hearing Exh. B-25 at 4.

Nor can the parents point to any statutory or regulatory requirement, in force at the relevant time period, that required the PPT to include a Maplebrook representative. The parents rely on 20 U.S.C. § 1401(a)(20), see Doc. No. 85 at 20, but the version of that statute in effect in June 2004 discusses "parent organizations" and does not pertain to the instant dispute.  The parents also rely on 34 C.F.R. § 300.533 (2002), but that regulation also contains nothing on point.  It does require the PPT to look at "[c]urrent classroom based assessments and observations," id. § 300.533(a)(1)(ii), as well as "[o]bservations by teachers and related services providers," id. § 300.533(a)(1)(iii). However, J.B. had yet to take a class at Maplebrook by June 2004; any available assessments and observations would not have been from Maplebrook officials.

A different federal regulation, 34 C.F.R. § 300.344 (2002), sets out who must be present on a team that develops the IEP.  Unless the parents make an affirmative request, see id. § 300.344(a)(6), nothing in that regulation requires the team to include a representative from a private school at which the student has yet to take classes.  As the parents have pointed to nothing in the record demonstrating that they requested the presence of a Maplebrook official, the court discerns no error in the composition of the PPT team.

Changing gears, the parents argue that the IEP was procedurally flawed because it did not contain goals and objectives that were sufficiently measurable.  As discussed above, IDEA requires each IEP to contain measurable annual goals.  See 20 U.S.C. § 1414(d)(A)(vi)(I).  A review of the IEP in this case shows that the stated goals plainly meet that standard.  See Hearing Exh. B-25 at 6-40.

The parents' remaining challenges are substantive.[33]  Their principal argument is that J.B. could only be educated in a fully segregated environment, such as the environment provided at Maplebrook.  See Doc. No. 85 at 27, 31-32.  They also take issue with various aspects of the 2004-2005 IEP, contending that the IEP's goals and objectives were deficient, Doc. No. 85 at 28-30, and that the services provided in the IEP were inappropriate.  Id. at 30-31.

In rejecting the parents' challenge, the HO concluded that the IEP's goals, objectives, and support services were appropriate, and that the placement at HVRHS

---

[33] Several arguments that the parents label as "procedural" are really substantive. These are the parents' claims that (1) the PPT's placement decision was not based on the child's unique needs and abilities; (2) the IEP did not include programming in all areas of J.B.'s disability; and (3) the IEP provided no adequate transition plan.

could provide J.B. with FAPE.  See A.R. 1 at 17-18.  Although the HO's analysis was not extensive, she appears to have reasoned that the 2004-2005 IEP cured the key defects that she identified in the 2003-2004 IEP.  See id. at 15-18.  The HO specifically noted that District 1 had made "significant changes."  Id. at 17.  This is sufficient reasoning for the court to accord the HO's conclusions at least a certain level of deference.  Cf. Walczak, 142 F.3d at 129 ("Deference is particularly appropriate when . . . the state hearing officer['s] review has been thorough and careful.").

There is certainly no basis to overturn the HO's implicit determination that J.B. did not require a private placement.  The BCH evaluation indicated that a resource room placement could be appropriate.  See Hearing Exh. P-5 at 12.  The parents' 2003 independent evaluation, while favoring a private placement, also stated that District 1 "has a long record of having crafted creative solutions . . . that allowed [J.B.] to make steady progress without having to leave home."  Hearing Exh. B-13 at 10.  The evaluator was presumably referring to the TOTAL program, and thus she also recognized that something akin to a resource room placement could be appropriate.[34]

The bulk of the 2004-2005 IEP in fact proposed something akin to a resource room placement.  With the exception of Biology, and J.B.'s non-academic classes, all of J.B.'s learning was to take place in a contained resource room.  It is thus not surprising that Theresa Terry, the District's Pupil Services Director and one of the key members of

---

[34] In her testimony before the HO, the independent evaluator took a slightly different tack, suggesting that a resource room would only be effective for J.B. if it were "all day long."  5/23/05 Hearing Tr. at 27.  Yet J.B.'s TOTAL program, which clearly did provide some benefit for J.B., was not an all-day resource room.  Instead, J.B.'s non-academic classes, including Band, Music, Art, and Gym, were provided in a mainstream environment.  See Hearing Exh. B-7 at 1

the PPT team, testified that she believed the independent evaluator's recommendations could be implemented within HVRHS.  10/4/05 Hearing Tr. at 162.

It may well be, as the parents claim and as the HO found, that J.B. made very little progress at HVRHS during the 2003-2004 school year.  Certainly, it is understandable that a student with J.B.'s disabilities, and who had an abbreviated middle school experience, would find it difficult to progress when thrown into a new environment like a high school.  But rather than simply prescribe more of the same, the school responded by offering J.B. increased special education time and increased support, including speech and language therapy.  The HO made an acceptable policy judgment, consistent with IDEA's preference for mainstreaming, when she concluded that this modified program could reasonably be expected to offer benefit to J.B., notwithstanding the results from the previous year.

The court also defers to the HO's conclusion that, on the whole, the objectives and support services offered in the 2004-2005 IEP were reasonably calculated to provide a non-trivial level of educational benefit.  This conclusion was largely supported by the parents' own experts.  Dr. Helen Bray-Garretson acknowledged that most of the goals and objectives in the IEP were reasonable and appropriate for J.B.  4/26/05 Hearing Tr. at 48-65.  Although she did have complaints about a few goals, and she had a couple of questions about implementation, her testimony suggested that the bulk of the IEP could be expected to deliver a decent amount of educational benefit for J.B. See id.  She ultimately testified unequivocally that the reading, writing, and math goals were appropriate, and she testified in a more wavering manner about the other goals. See id. at 71-72.

54

The parents' independent evaluator, Diane Dillon, testified somewhat similarly, and she too indicated her belief that the bulk of the goals and objectives were appropriately tailored to J.B.'s needs. 5/4/05 Hearing Tr. at 69, 75, 79-109, 112-116. Moreover, some of her objections to the IEP miss the mark. For instance, Dillon testified that it was inappropriate for J.B. to be placed in regular physical education because of the social context, and because of its instructional content. Id. at 70. However, Dillon also testified that she had never observed J.B. in any classes. 5/23/05 Hearing Tr. at 15-17. Meanwhile, Physical Therapist Ginni Block observed J.B. in his physical education class at HVRHS and reported that he was able to keep up with many of the class activities. Hearing Exh. B-16 at 3. Her report also relayed the observations of the gym teacher that J.B. had a great attitude in class and was enthusiastic about the activities. Id. Additionally, Dillon's sole objection to the transition goals was that they prepared J.B. directly for work without preparing him for the option of post-secondary training. 5/4/05 Hearing Tr. at 97-99. Dillon's criticism did not deny that J.B. would receive a reasonable degree of benefit from the transition goals in the IEP. That is, Dillon's criticism did not speak to a denial of FAPE.

Moreover, to the extent that Dillon had an overriding objection to the IEP, it was really to the fact that J.B. was not in a segregated environment – a fact that Dillon believed interfered with J.B.'s ability to develop socially. 5/4/05 Hearing Tr. at 71-73. As discussed above, the HO was well-justified in rejecting the premise that a fully segregated environment was needed. This decision was consistent with the statutory preference for mainstreaming, and merits deference. The HO had a basis to conclude that J.B. was likely to receive a reasonable level of educational benefit at HVRHS.

55

Ultimately, the parents have not presented sufficient justification for overturning the HO's conclusion that the 2004-2005 IEP was reasonably calculated to provide J.B. with FAPE.

D.     Rehabilitation Act Claims

The parents next claim that the school district violated Section 504 of the Rehabilitation Act, 29 U.S.C. § 794.  They assert this claim for 2002-2003, 2003-2004, 2004-2005, and Summers 2003, 2004, and 2005.[35]

Section 504 of the Rehabilitation Act applies to entities that receive federal funds (which District 1 apparently is), and it prohibits such entities from excluding disabled individuals from program benefits because of their disabilities.[36]  Under the federal regulations which implement Section 504, the denial of a FAPE to a disabled student can constitute covered disability discrimination.  34 C.F.R. § 104.33(a) (2002); see also J.D., 224 F.3d at 70-71.

The parents' Section 504 claim is primarily premised on their belief that J.B. was denied a FAPE.  However, the parents' Complaint briefly alleged two other grounds for this claim: that District 1 permitted J.B. to be subject to bullying, and that District 1 failed to have the required grievance procedures for dealing with allegations of Section 504 violations.

---

[35] The parents also assert this claim for later time periods.  However, because the parents filed their due process hearing request in February 2005, their claims for later periods cannot proceed in this action, as discussed above.  See supra p. 27-28.

[36] The statute provides that "[n]o otherwise qualified individual with a disability . . . shall, solely by reason of her or his disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance . . . ."  29 U.S.C. § 794.

District 1's Motion for Summary Judgment argued that the parents had failed to present a viable claim under the bullying theory, Doc. No. 65 at 44-47, and the parents did not address this argument in their Opposition. They did not point to any record evidence supporting the bullying claim, and none of their summary judgment motions sought summary judgment on this theory. In light of the court's clear instructions at oral argument, the court deems the parents to have abandoned this claim.

As for the parents' claim based on the lack of required grievance procedures, those procedures are not actually part of the statute itself, but instead are part of the implementing regulations for Section 504. See 29 U.S.C. § 794; 34 C.F.R. § 104.7 (2002). A violation of these regulations, solely in themselves, does not give rise to a private right of action under the Rehabilitation Act. See A.W. ex rel. Ms. C. v. Marlborough Co., 25 F. Supp. 2d 27, 30-31 (D. Conn. 1998). The court therefore grants summary judgment to District 1 on this aspect of the parents' Rehabilitation Act claim.

This leaves the parents' Rehabilitation Act claim based on denial of a FAPE. Because denial of a FAPE is an actionable claim under IDEA, there is obvious overlap between Section 504 and IDEA. Nonetheless, there is at least one important difference between claims under the two statutes: unlike IDEA, the Rehabilitation Act only remedies acts of intentional discrimination against the disabled. See Bartlett v. N.Y. State Bd. of Law Examiners, 156 F.3d 321, 331 (2d Cir. 1998), vacated on other grounds, 527 U.S. 1031 (1999). As applied to this case, the parents must therefore present evidence that District 1 was, at the minimum, deliberately indifferent to a strong

likelihood that J.B.'s federal rights would be violated.[37]  See id.

With that standard in mind, the parents' strongest claims under the Rehabilitation Act pertain to the denial of a FAPE for the 2003-2004 school year, and for Summers 2004 and 2005.  However, even assuming that the parents can establish liability for the school district's actions during these periods, the parents have not established that they are entitled to compensatory damages because the HO's reimbursement awards for these two summers, and her compensatory education award for 2003-2004, already provide full remedies for any FAPE denials that occurred during these time periods. The parents cannot use the Rehabilitation Act to obtain double-recovery for IDEA violations.

Indeed, this bar on double-recovery is implicit in the Second Circuit's exhaustion jurisprudence.  In Polera, a student brought a Rehabilitation Act claim premised on a district's denial of a FAPE.  288 F.3d at 480.  The student did not raise an IDEA claim, although one was available to her, and she also did not pursue her Rehabilitation Act claim through the IDEA administrative process.  Id. at 481.  The Second Circuit concluded that the student's Rehabilitation Act claim was barred due to lack of exhaustion, notwithstanding the fact that the student sought compensatory damages, a remedy not actually available under IDEA.  Id. at 486-488.  The court explained that IDEA was intended to provide a remedy for exactly this kind of situation (through its use

_____

[37] Some courts in this circuit have gone as far as to say that the plaintiff must show something akin to "bad faith or gross misjudgment."  See, e.g., B.L. v. New Britain Bd. of Educ., 394 F. Supp. 2d 522, 540 (D. Conn. 2005); Gabel ex rel. L.G. v. Bd. of Educ. of Hyde Park Cent. Sch. Dist., 368 F. Supp. 2d 313, 334 (S.D.N.Y. 2005).  It is not entirely clear how this formulation compares to the formulation discussed in Bartlett, and these court decisions do not discuss the issue.

of equitable remedies), and that it was Congress's intent that these kinds of disputes be handled in the first instance by administrators with special educational expertise. Id. The court stressed the importance of allowing administrators to have the first opportunity to come up with what could be a complete remedy. Id.

Implicit in Polera is the understanding that, if an administrator does provide a complete remedy, the parents will not be able to assert a parallel Rehabilitation Act claim. Indeed, in this case J.B.'s parents gave the HO the first opportunity to devise a remedy for the problems they identified with J.B.'s IEPs for two summers and for 2003-2004. The HO in fact gave J.B.'s parents a complete remedy. If Polera does not allow the Brennans to choose their preferred form of relief, it certainly would not allow them to obtain duplicate relief.[38]

This leaves the parents' Rehabilitation Act claims for 2002-2003, 2004-2005, and Summer 2003. The court has already concluded that J.B. was not denied FAPE for these time periods, and so the Rehabilitation Act claims must fail.

Moreover, even if there was a FAPE denial during those periods, the defendants correctly point out that there is no evidence of deliberate indifference by District 1. Doc. 65 at 40-41. The parents' Opposition does not argue otherwise, nor does it point to any evidence of deliberate indifference regarding those time periods.

Indeed, undisputed evidence confirms that District 1 did not act with deliberate indifference in developing J.B.'s IEPs for these years. For 2002-2003, J.B.'s TOTAL

---

[38] The parents also suggest that they are entitled to punitive damages. However, punitive damages are not available under the Rehabilitation Act. See Barnes v. Gorman, 536 U.S. 181, 189 (2002).

placement was based in part on the parents' request that J.B. remain in the TOTAL program rather than move to a more mainstream social grouping. This shows that the district was responsive to parental concerns. Moreover, the TOTAL program provided J.B. with a comprehensive education, including physical therapy, counseling on social skills, pragmatic language skills, and speech therapy. District 1's 56(a)(1) Stat. at ¶ 16; see also Parents 56(a)(2) Stat. at ¶ 16 (failing to provide record citations to dispute this). The parents have failed to create a disputed issue of material fact surrounding whether District 1 acted with deliberate indifference to J.B.'s right to a FAPE during 2002-2003.

As for 2004-2005, there is no dispute that the school district made a real effort to be responsive to J.B.'s needs and to try to rectify the deficiencies that might have existed in J.B.'s 2003-2004 IEP. District 1 also conducted additional speech and language testing of J.B. in preparing the 2004-2005 IEP. Thus, even assuming the 2004-2005 IEP denied a FAPE, there is no evidence of the deliberate indifference necessary to sustain liability under the Rehabilitation Act.

Finally, the parents have pointed to no evidence at all surrounding Summer 2003. As discussed above, the parents have not cited anything in the record that would have put District 1 on notice of the need for extended year services during Summer 2003. Without such evidence, it becomes impossible to establish deliberate indifference.

The court grants summary judgment to District 1 on all of the parents' Rehabilitation Act claims.

E.    ADA Claims

The parents also assert all of their Rehabilitation Act claims under the Americans with Disabilities Act (ADA), 42 U.S.C. § 12132 et seq.  Both sides agree that the analysis under the ADA is identical to the analysis under the Rehabilitation Act.  See Doc No. 65 at 42 n.7; Doc. No. 74 at 9-10.  Accordingly, the court's outcome is the same, and it grants District 1 summary judgment on all of the parents' ADA claims.

F.    Section 1983 Claims

District 1 contends that it is entitled to summary judgment on the parents' Section 1983 claims.  In the parents' third summary judgment motion, they indicated that they have now abandoned these claims.  See Doc. No. 94 at 38.  The court grants District 1 summary judgment on these claims.

G.    Consent Decree Claims

The parents' final set of claims stems from their belief that the HO failed to issue a ruling on a number of claims that were properly before her.  The parents believe that the HO's failure to do so constituted a violation of a consent decree that several state officials had entered into in connection with a 1991 federal court action.

As an initial matter, the consent decree explicitly states that it does not actually bind any hearing officers.  See Doc. No. 66, Exh. G. at 1.  The decree merely requires various state officials to advise hearing officers about their obligations under Connecticut law.  Id. at 2-3.

Additionally, there is no indication that District 1 was a party to the 1991 litigation, and therefore there is no indication that the decree is enforceable against District 1.  And even if it were enforceable, it is not clear that this court would have jurisdiction to

entertain a claim for enforcement as a separate lawsuit.  See Kokkonnen v. Guardian Life Ins. Co. of Am., 511 U.S. 375, 378, 380-81 (1994).

In any event, the court understands the parents to not actually be asserting an enforcement claim, or a separate claim for relief pursuant to the consent decree. Instead, the "relief" the parents seek is simply that this court consider the issues that the hearing officer overlooked.  See Doc. No. 94 at 33-34, 37-38.  To the extent that the issues are properly before this court, the court has already done so.  And to the extent that the issues are not properly before this court, (e.g. due to lack of exhaustion), the consent decree contains nothing that could otherwise properly bring those issues to the court for resolution.

## V.    ATTORNEY'S FEES

In their Complaint, the parents also contend that they are entitled to a fee award as prevailing parties on their IDEA claims.  However, the parents have not yet filed a motion for a fee award, together with any affidavits demonstrating the basis for the rate claimed and the amount of time their attorney has worked on this case.  District 1 has argued in its filings that an award of attorneys fees is premature at this time.[39]

The parents have until **January 17, 2007**, to file such a motion, with accompanying affidavits and evidentiary support.  District 1 will have 21 days to respond, and the parents will have 10 days after that to file a reply.  The court does not

_____

[39] In later filings, District 1 has taken the position that the parents abandoned this claim when they failed to move for summary judgment on it in their most recent summary judgment motion.  The court disagrees; because claims for attorneys fees are not themselves substantive claims, but instead are collateral to the merits, the court's comments at oral argument were not intended to, and did not, force the parents to move for summary judgment regarding attorney's fees.

expect to grant any motions for extension of these deadlines.

**VI.    CONCLUSION**

The parents' Motion to "Strike" the Complaint in Case No. 3:07-cv-867 (JCH) [Doc. Nos. 45 & 56] is **GRANTED** and District 1's Complaint is **DISMISSED** for failure to state a claim upon which relief can be granted.

The parents' Motion For Partial Summary Judgment [Doc. No. 28] is **DENIED**. The parents' Motion To Expedite [Doc. No. 31] is **DENIED AS MOOT**.  The parents' claim for enforcement of the HO's award is **DISMISSED**.

The parents' Motion For Summary Judgment [Doc. No. 66] is **GRANTED IN PART** and **DENIED IN PART**.  District 1 is ordered to reimburse the parents for J.B.'s tuition at Maplebrook from August 10, 2006 until such point as Maplebrook is no longer J.B.'s stay-put placement pursuant to IDEA, or until the dispute over the 2004-2005 school year is finally resolved, whichever is sooner.

District 1's Motion For Summary Judgment [Doc. No. 64] is **GRANTED IN PART** and **DENIED IN PART**.  District 1's Motion to Strike [Doc. No. 77] is **DENIED AS MOOT**.  The Parents' Third Motion for Summary Judgment [Doc. No. 82] is **DENIED**. Judgment will enter for District 1 on all of the parents' substantive claims other than their stay-put claim.

**SO ORDERED.**

Dated at Bridgeport, Connecticut this 27th day of December, 2007.

/s/ Janet C. Hall
Janet C. Hall
United States District Judge